[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-12744

_____

D.C. Docket No. 1:13-cr-00117-DHB-BKE-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RICHARD LEE OWEN, II,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(June 24, 2020)

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR and LUCK, Circuit Judges.

JILL PRYOR, Circuit Judge:

After representing himself through two days of his criminal trial, appellant

Richard Owen II pled guilty to one charge of bank fraud, in violation of 18 U.S.C.

§ 1344, and one charge of money laundering, in violation of 18 U.S.C.

§ 1956(a)(1)(B)(i), and was sentenced to 236 months' imprisonment.  On appeal,

Owen challenges his convictions on the ground that his Sixth Amendment right to

counsel was violated when the district court allowed him to represent himself at

trial because he did not knowingly waive his right to counsel.  The record

establishes, however, that Owen's waiver of his right to counsel was knowing,

intelligent, and voluntary; we therefore affirm his convictions.

Owen also challenges a series of orders in which the district court directed

the payment of $6,500 from Owen's jail account into the court's registry and then

ordered that the money be paid to reimburse the United States Treasury to cover

the fees and expenses of Owen's appointed counsel.  *See* 18 U.S.C. § 3006A(f)

(authorizing a district court, when a defendant who is furnished court-appointed

representation has funds available, to order that the money be paid to the Treasury

to reimburse fees and expenses of his court-appointed counsel).  Owen raises two

challenges to the district court's orders:  (1) § 3006A(f) did not authorize the

district court to seize money from his jail account because the district court failed

to follow the procedures set forth in the statute, and (2) because the funds in his jail

account came from Social Security benefits, the court could not use this money to

reimburse the Treasury for his counsel's fees and expenses.  We reject the first

argument because the district court followed the proper procedures under § 3006A

2

before directing that Owen's money be paid from the court registry to the Treasury, and we lack jurisdiction to consider the second argument. Accordingly, we affirm in part and dismiss in part this portion of the appeal.

## I.    FACTUAL BACKGROUND

In this case, the government alleged that Owen exploited his role as a paralegal for the Victor Hawk Law Firm to steal money from the firm's trust account. One of Owen's job responsibilities was to sign checks from the firm's trust account, using a signature stamp with the name of the firm's principal, to pay settlement funds to clients. In a number of instances, Owen prepared checks that purported to be disbursements of settlement funds to clients. But rather than send the checks to the clients, Owen forged the clients' signatures on the checks and deposited them into his own bank account. To keep the attorneys at the firm from uncovering his fraud, Owen created a false set of books and records to make it appear that the transactions were legitimate. By the time the fraud was uncovered, Owen had stolen more than $500,000. He was charged with 184 counts of bank fraud, in violation of 18 U.S.C. § 1344; 15 charges of aggravated identify theft, in violation of 18 U.S.C. § 1028A; and 54 counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) or § 1957.

## A.    Unhappy with His Appointed Counsel, Owen Sought to Represent Himself.

After Owen was arrested, the district court appointed attorney Beau Worthington[1] to represent Owen because Owen was financially unable to obtain adequate representation. *See* 18 U.S.C. § 3006A(b).  Owen initially decided to plead guilty.  Worthington negotiated a plea agreement with the government, which Owen signed.  But Owen changed his mind, withdrew his guilty plea, and decided to proceed to trial.

After withdrawing his guilty plea, Owen began to complain about Worthington's representation.  He accused Worthington of having pressured him to sign the plea agreement.  Owen also claimed that Worthington was not assisting him in preparing the defense that he intended to raise, which was that Victor Hawk, the law firm's principal partner, was aware of Owen's actions and directed him to forge clients' signatures on checks and deposit them into Owen's own account.[2]  To develop this defense, Owen sought banking records for every transaction in the law firm's trust account.  Worthington advised Owen that the

---

[1] At first, the court appointed a different attorney to represent Owen.  But after representing Owen for just one day, the attorney realized that he had a potential conflict of interest, and the court appointed Worthington.

[2] We note that Owen presented no evidence to support his claim that Hawk knew about and directed his criminal activities.  Before trial, Owen told the government that a Wells Fargo teller would corroborate his story because Hawk told the teller that Owen could deposit the checks into his personal account.  But when the government tracked down the teller, he denied that any such conversation occurred.

4

court probably would not allow him to pursue this defense at trial, presumably because even if Hawk knew about Owen's actions, forging a client's signature on a check still would be bank fraud.  Worthington nonetheless followed Owen's direction and sought all the banking records.  But the court limited the scope of the subpoena to banking records related to transactions involving the clients of the firm who were victims of the fraud, concluding that Owen's broader request sought "irrelevant" information and amounted to a "fishing expedition."  Doc. 67 at 1.[3]

Frustrated with the progress of his case, Owen accused Worthington of providing ineffective assistance of counsel and asked the court to appoint replacement counsel.  After holding multiple hearings concerning Worthington's representation of Owen, the court refused to appoint replacement counsel.

Just two business days before trial, Owen filed with the court a document entitled "Waiver of Counsel And Election to Proceed Pro Se," stating that he wanted to waive his right to the assistance of counsel and conduct his own defense at trial.  Doc. 162 at 1.  In the filing, Owen represented that he was "competent," "suffer[ed] from no mental disabilities," and was of "sound mind and discretion." *Id.*  He certified that he "freely, voluntarily, knowingly[,] and intelligently

---

[3] Citations in the form "Doc. #" refer to the numbered entries on the district court's docket.

5

waive[d]" his right to counsel. *Id.* at 2. He requested a continuance so that he could "promptly prepare" the case and "secure additional documents." *Id.*

On the morning the trial was set to begin, the district court held an *ex parte* hearing to consider Owen's request to represent himself. The court questioned Owen about the waiver of counsel filing. In response, Owen stated that he had read the document, it expressed his true intentions, and all the statements in it were true.

The district court then asked Owen questions to establish the extent of his preparation and knowledge about the case. Owen stated that he had received a copy of the most recent indictment, read it many times, and understood its charges and allegations. He also indicated that he was familiar with the maximum penalties for the charges in the indictment. When the court asked him about his familiarity with the law, Owen professed some skill in the law, telling the court that he knew how to perform legal research from his work as a paralegal and had represented himself in several prior criminal jury trials. The district court asked Owen whether anyone forced, threatened, or pressured him to waive counsel. Owen responded, "Other than the fact that I don't think this case can be tried the way it is being tried, no." Doc. 242 at 10.

Owen told the court that he wanted to represent himself because Worthington had failed to obtain documents and records necessary to show that

6

Hawk knew about and directed Owen's actions. He argued that evidence showing Hawk knew about his actions would establish that he lacked an intent to defraud, stating "I don't know if you can steal your own money." *Id.* at 15. The court rejected his argument, explaining, "[y]ou can certainly defraud your own bank." *Id.*

After hearing from Owen, the court decided to allow him to represent himself at trial. The court offered to have Worthington assist Owen as standby counsel during jury selection, but Owen declined the assistance.

When the government's attorneys returned to the courtroom, the court considered Owen's request for a continuance. The government opposed the request, explaining that it was ready to proceed with trial and had brought approximately 50 witnesses to testify. The district court denied the continuance, and the case proceeded to trial.

## B.    Owen Represented Himself Through Two Days of Trial.

Owen's criminal trial lasted for two days before he again decided to plead guilty. During these two days, the government presented testimony from a number of witnesses, mainly clients of the law firm whose signatures had been forged on checks deposited into Owen's account. Each of the clients was shown a check or series of checks from the law firm's trust account that had been made out to the witness and signed on the back. Each witness testified that he or she had never

7

received the check(s), signed the check(s), or given anyone else permission to sign the check(s).

Besides the testimony from the firm's clients, the jury also heard testimony from Melissa Detchemendy, a lawyer who had worked at the Victor Hawk Law Firm for more than ten years. Detchemendy explained that Owen's responsibilities at the law firm included writing checks from the firm's trust account and keeping records to track payments made from the trust account. She explained that Owen stole money from the trust account by writing checks from the firm's trust account to clients, forging endorsements from the clients, and depositing the money into his own bank account. She described how Owen covered up his theft by forging bookkeeping records to make it appear that the clients had received the payments. Detchemendy testified that Owen never was given permission to sign a client's name on a check or to deposit a check made out to a client into his personal bank account.

During the trial, Owen actively participated in his defense. In jury selection, he followed proper procedures, asking potential jurors questions to identify whether they had any bias or improper influences, and succeeded in persuading the court to excuse three jurors for cause. Before the trial began, Owen requested that the court give a preliminary instruction that his self-representation should not be held against him, and the court agreed to give the instruction. During trial, he

cross-examined many, though not all, of the government's witnesses. And he successfully persuaded the court to exclude at least one exhibit that the government sought to introduce into evidence.

## C.    After Two Days of Trial, Owen Pled Guilty.

At the end of the second day of trial, before the government completed its case-in-chief, Owen agreed to plead guilty to one count of bank fraud and one count of money laundering in exchange for the dismissal of the remaining charges, including the aggravated identity theft charges. In a written plea agreement, Owen admitted that he had engaged in conduct that met the essential elements of the offenses to which he was pleading guilty and waived his right to appeal his convictions or sentence. Owen certified that he had read and understood the agreement and voluntarily agreed to it.

Later that evening, the district court held a change-of-plea hearing. The court placed Owen under oath and advised him of his right to be represented by counsel. Owen indicated that he had waived his right to counsel and wished to continue to represent himself. The court then announced that, having observed Owen over two days of trial, it had "no hesitation" in finding Owen competent to enter a plea. Doc. 217 at 3. After noting that Owen was 68 years old, the court found that he had a "great deal of practical, if not formal, education" and was "skilled and proficient in the English language." *Id.* at 4. The court further found

9

that Owen had been lucid, rational, and "very attentive" during trial. *Id.* at 5.  But because the change-of-plea hearing was taking place after a full day of trial, the court offered to continue the hearing until the following morning.  Owen declined, insisting that he was prepared to go forward.  After the court reviewed the terms of the plea agreement with him, Owen admitted that he was guilty of the charged offenses.  The court accepted Owen's plea and found him guilty.

By the time of his sentencing, Owen had admitted in an affidavit that he had stolen from the law firm's trust account.  He conceded in the affidavit that none of the attorneys at the firm knew he was stealing from the trust account.  At the sentencing hearing, where Owen was represented by counsel, the district court sentenced Owen to 236 months' imprisonment, a sentence in the middle of the range calculated under the Sentencing Guidelines.

**D.    During Owen's Criminal Proceedings, the District Court Ordered that $6,500 Belonging to Owen Be Paid to the Treasury to Cover the Fees and Expenses of Owen's Appointed Counsel.**

Before and after Owen's trial, the district court issued a series of orders directing that funds in Owen's jail account be paid into the court's registry and later used to reimburse the Treasury for the fees and expenses of his appointed counsel.  After he was arrested, Owen was detained in a local jail pending trial.  Before trial, the district court learned that approximately $7,000 had been

10

deposited into Owen's jail account and that deposits of $500 or more were being made to the account each month.

The district court entered an order directing the sheriff of the county where the jail was located to pay $6,500 from Owen's jail account into the court's registry. The court explained that Owen's jail account balance far exceeded what was required to satisfy his needs while in custody and the court was not inclined to pay Owen's appointed counsel entirely from public funds when Owen had a large amount of money at his disposal. The next day, the county sheriff deposited the funds into the court's registry. The court directed that the funds would remain in the court's registry and would not be paid out "without notice and hearing to the defendant." Doc. 265 at 13.

After Owen pled guilty, he filed a motion seeking the return of the money held in the court's registry. He argued that the money should be returned to him because it came from Social Security benefit payments. To support his contention that the money represented Social Security benefit payments, he submitted two affidavits—one from himself and one from Joel Asher, his adopted son. Asher's affidavit explained that he had opened a Bank of America account where Owen's Social Security benefit payments were deposited each month and that no other money was deposited into that account. Asher's affidavit also said that he sent money from the Bank of America account to Owen's jail account each month. In

11

his affidavit, Owen represented that all the money in his jail account came from his Social Security benefits.

After a hearing, the court made provisional findings regarding the funds held in the court's registry. The court acknowledged that Social Security benefits generally were exempt from most forms of attachment, garnishment, and levy but explained that these protections did not apply when the benefit payments were commingled with other funds. The court concluded that Owen failed to establish that the funds in the court's registry came solely from his Social Security benefit payments and had not been commingled with other funds. The court rejected the affidavits as "self-serving," noting that Owen failed to produce any bank statements or other records showing that the money in his jail account came from the Bank of America account Asher had opened. Doc. 266 at 24. The court then explained that it would continue to hold the money in the court's registry until Owen was sentenced. At his sentencing hearing, Owen provided the court with copies of monthly statements from the Bank of America account.

After considering the new evidence, the court ordered that the funds in the court's registry be paid to the court's Criminal Justice Act ("CJA")[4] account to reimburse the fees and expenses of Owen's appointed counsel. Doc. 205 at 6. The court found, after reviewing the records from Owen's jail account and the Bank of

---

[4] *See* Criminal Justice Act of 1964, 18 U.S.C. § 3006A.

America account, that the money in Owen's jail account could not be traced exclusively to his Social Security benefit payments. The court accepted that the bank statements showed that Social Security benefit payments were deposited into the Bank of America account. But after comparing the bank statements to the records from Owen's jail account, the court found that Owen had not established that Social Security benefits were the "original source of *all* funds" deposited in the jail account. Doc. 205 at 3 (emphasis added). For example, the jail account records showed a single deposit of $5,643.11, and there was no correlation between this large deposit and the sporadic ATM withdrawals from the Bank of America account shown in the bank records. In another example, the records showed a deposit of $500 into Owen's jail account. The bank statement showed that shortly before making this deposit, Asher had withdrawn $200 from the Bank of America account, but there was no evidence that the remaining $300 came from the bank account. Thus, the remaining funds had to have come from another source.

But even assuming the money in Owen's jail account could be traced entirely to his Social Security benefits, the district court explained, the court would not return the money to Owen because he had "no need of a stipend provided by the taxpayers of the United States of America while he is incarcerated." *Id.* at 4.

13

Since Owen had been arrested, he had been held in jail where he received "ample food, clothing, shelter, and abundant medical care." *Id.* at 5.

## II.    LEGAL ANALYSIS

On appeal, Owen, represented by new appointed counsel, raises two distinct arguments. First, he claims the district court erred in allowing him to represent himself at trial because, under *Faretta v. California*, 422 U.S. 806 (1975), he never validly waived his Sixth Amendment right to counsel. Second, he challenges the district court's orders seizing funds from his jail account and using them to pay a portion of his appointed counsel's fees and expenses. We address each argument in turn.

## A.    The Challenge to the District Court's Order Permitting Owen to Represent Himself

Owen argues that his convictions are invalid because the court failed to conduct a thorough inquiry to determine whether he waived his right to counsel knowingly, intelligently, and voluntarily. Because the record shows that Owen's waiver was knowing, intelligent, and voluntary, we see no error.

The Sixth Amendment to the United States Constitution gives criminal defendants both the right to counsel and the right to represent themselves. *See Faretta*, 422 U.S. at 819-20. To waive his Sixth Amendment right to counsel, a defendant "must clearly and unequivocally assert the right of self-representation." *Fitzpatrick v. Wainwright*, 800 F.2d 1057, 1064 (11th Cir. 1986). In addition, the

14

waiver must be "knowing, intelligent, and voluntary." *United States v. Fant*, 890 F.2d 408, 409 (11th Cir. 1989). The government bears the burden of proving the waiver's validity. *See Greene v. United States*, 880 F.2d 1299, 1303 n.6 (11th Cir. 1989).[5]

The "ideal method of assuring that a waiver is valid is for the trial court to conduct a pretrial hearing at which the accused is informed of the charges, basic trial procedures, and hazards of self-representation." *United States v. Cash*, 47 F.3d 1083, 1088 (11th Cir. 1995). The purpose of this hearing, known as a *Faretta* inquiry, is to afford the judge an opportunity to determine whether "the defendant understands the risks of self-representation." *United States v. Kimball*, 291 F.3d 726, 730 (11th Cir. 2002). We have warned that the "closer such a waiver hearing is to trial, the more rigorous, searching, and formal the questioning of the trial judge should be." *Strozier v. Newsome*, 926 F.2d 1100, 1105 (11th Cir. 1991).

---

[5] Whether a defendant validly waived his right to counsel is a mixed question of law and fact that we ordinarily review *de novo*. *United States v. Garey*, 540 F.3d 1253, 1268 (11th Cir. 2008) (en banc). But we have not decided whether, when a defendant raises a *Faretta* claim for the first time on appeal, we review the claim under a *de novo* or plain error standard. *See United States v. Stanley*, 739 F.3d 633, 644-45 (11th Cir. 2014). In *Stanley*, after acknowledging that the question of the proper standard of review was "unsettled," we declined to resolve the issue because the defendant's *Faretta* claim failed under even a *de novo* standard. *Id.* at 645. Likewise, here we need not decide which standard of review applies because Owen's *Faretta* claim fails even on *de novo* review.

15

But "[t]he ultimate test is not the trial court's express advice, but rather the defendant's understanding." *Id.* (internal quotation marks omitted). "As long as the record establishes that the defendant understood the risks of self-representation and freely chose to face them, the waiver may be valid." *Id.*; *see also Jones v. Walker*, 540 F.3d 1277, 1293 (11th Cir. 2008) (en banc) (explaining that "it is irrelevant for constitutional purposes whether [a defendant's] understanding comes from a colloquy with the trial court, a conversation with his counsel, or his own research or experience"). We therefore may look to what occurred at trial to establish what would have been true at the time the defendant waived his rights. *United States v. Stanley*, 739 F.3d 633, 646 (11th Cir. 2014).

To determine whether a defendant's waiver of his right to counsel was knowing and voluntary, we consider eight factors: (1) the defendant's age, educational background, and physical and mental health; (2) the extent of the defendant's contact with lawyers prior to trial; (3) the defendant's knowledge of the nature of the charges, possible defenses, and penalties; (4) the defendant's understanding of rules of procedure, evidence, and courtroom decorum; (5) the defendant's experience in criminal trials; (6) whether standby counsel was appointed, and the extent to which that counsel aided the defendant; (7) mistreatment or coercion of the defendant; and (8) whether the defendant was

16

trying to manipulate the events of the trial. *Id.* at 645-46. A defendant's waiver may be valid even when some of these factors weigh in his favor. *See id.* at 648.

Owen argues that most of the factors weigh in his favor. After considering the record—including the transcripts of earlier hearings, the hearing in which the district court permitted Owen to represent himself, and the trial—we disagree. To the contrary, application of the factors leads to the conclusion that Owen's waiver was knowing, intelligent, and voluntary.

We begin with the first factor, Owen's age, health, and education. At the time of trial, Owen was 68 years old, had worked for many years as a paralegal, and professed a level of skill in the law. Owen admitted to the district court—and does not now dispute—that he suffered from no mental disabilities at the time of trial. He points out that he suffered some physical limitations due to illness. But the record shows that the court accommodated these limitations by giving Owen frequent breaks and allowing him to sit down when he addressed the court.

Owen argues that this factor weighs in his favor even so, because he was elderly at the time of trial. But he cites no authority suggesting that a 68-year-old defendant is so elderly that his age alone makes it unlikely that his waiver was knowing, voluntary, or intelligent. We previously rejected a similar argument by a defendant who was 60 years old when he decided to represent himself. *See Kimball*, 291 F.3d at 731. Owen was slightly older than the defendant in *Kimball*,

17

true, but we cannot say he was so old that this factor counts against the validity of his waiver.

We now turn to the second factor, Owen's contact with his lawyer before trial. Although Owen was detained before trial, the record shows that he had regular contact with his appointed lawyer. During the 12-month period when Worthington represented him, they met in person more than 15 times and spoke on the phone another 15 to 20 times. Owen's lengthy pre-trial relationship and frequent contact with his court-appointed attorney supports finding a valid waiver.

The third factor—Owen's knowledge of the nature of the charges, possible defenses, and penalties—also points toward his waiver's validity. During the district court's *Faretta* inquiry, Owen admitted that he had reviewed the most recent indictment, read it many times, and understood its charges and allegations. His responses to the district court's questions further established that he was aware of the maximum penalties for the charges in the indictment.

Owen nonetheless argues that this factor weighs in his favor because he misunderstood the lack-of-intent defense, believing that if he acted at Hawk's direction, he lacked the necessary intent. But the record contradicts his argument: Owen was warned repeatedly before trial that this defense was not viable. Worthington advised Owen about the problem with this defense, and when Owen raised the theory to the district court, the court explained that the defense would

18

not succeed because forging client signatures on checks constituted bank fraud even if Hawk knew and approved of Owen's actions.

Not only was Owen repeatedly warned that his legal theory offered no defense, but it appears that he knew there was no factual basis for it, either. After he pled guilty, Owen admitted that no one at the firm knew he was taking money from the trust account. Because Hawk never knew of, much less directed, Owen's criminal actions, Owen had to have known that he had no meritorious lack-of-intent defense.

The fourth and fifth factors—Owen's understanding of the rules of procedure, evidence, and courtroom decorum and his experience in criminal trials—also support that his waiver was knowing, intelligent, and voluntary. Owen was familiar with the procedures governing criminal trials based on his experience working as a paralegal and representing himself in five prior criminal cases, at least two of which went to trial.[6] Further, the trial record confirms that Owen understood the rules of criminal procedure, evidence, and courtroom decorum. During voir dire, he successfully struck several jurors for cause. He also persuaded the district court to give a preliminary instruction to the jury that his self-

---

[6] Owen argues that we should not consider his experience from the prior cases where he represented himself because they were in state, rather than federal, court. But he has identified no authority indicating that we must limit our inquiry to a defendant's prior experience representing himself in federal court.

19

representation should not be held against him. He cross-examined the government's witnesses and sufficiently understood the rules of evidence to persuade the court to exclude a government exhibit.

Owen argues that the trial transcript reveals that he lacked sufficient experience and did not understand the rules of procedure, evidence, and courtroom decorum because after two days of trial he gave up and pled guilty. But we fail to see how Owen's decision to admit guilt after two days of trial shows that he lacked the requisite understanding of trial rules and procedures.[7] *See Kimball*, 291 F.3d at 731 (explaining that our inquiry is limited to whether the defendant "understood that rules do exist to govern the procedure of a trial, the introduction of evidence[,] and the behavior of advocates and to determine whether [he] understood that he would be bound by those rules").

---

[7] Owen contends that he received no "actual benefit" from pleading guilty because he ultimately received a substantial sentence for his crimes. Appellant's Br. at 26. But he overlooks that in exchange for the plea the government agreed to drop the 15 aggravated identify theft counts charged in the indictment, each of which carried a potential two-year consecutive term. *See* 18 U.S.C. § 1028A(b); *United States v. Taylor*, 818 F.3d 671, 675 (11th Cir. 2016) ("[A] defendant convicted under § 1028A automatically receives an additional two-year increase to his or her sentence . . . ."). If Owen had been found guilty of each aggravated identify theft count, the district court would have been required to sentence him to an additional consecutive term, between two and 30 years, depending on whether the district court decided to run the sentences for all the aggravated identify theft offenses concurrently or consecutively with one another. *See* 18 U.S.C. § 1028A(b)(4) (giving district court discretion in cases involving multiple aggravated identity theft convictions to impose concurrent or consecutive two-year sentences for each such conviction).

With respect to the sixth factor, we look to whether standby counsel was appointed. Here, the district court appointed no standby counsel. The court offered to have Worthington assist Owen for at least a portion of the trial, but Owen refused the assistance. It does not appear that we have previously addressed how to apply this factor when the court offers a defendant the assistance of standby counsel and he refuses. In the absence of such authority, we give Owen the benefit of the doubt and assume that this factor weighs in his favor.

On the seventh factor, we consider whether Owen was mistreated or coerced into waiving his right to counsel. Owen repeatedly affirmed to the court that he was not mistreated or coerced. In his waiver of counsel form, Owen certified to the court that he "freely, voluntarily, knowingly[,] and intelligently" waived his right to counsel. Doc. 162 at 2. And at the hearing on the morning of trial, the court asked Owen whether he was being forced, threatened, or pressured into waiving his right to counsel. Owen indicated that he was not, except he did not think the case could be tried in the way that his attorney planned to try it.

Owen repeats this argument on appeal, asserting that he never wanted to represent himself but was forced to do so because his attorney wanted him to plead guilty and the court refused to appoint him another attorney. But we have previously rejected the argument that a defendant's decision to represent himself was involuntary simply because the court denied his request for replacement

21

counsel. *See United States v. Garey*, 540 F.3d 1253, 1269 (11th Cir. 2008) (en banc). Worthington stood ready to defend Owen at trial; Owen was not coerced into representing himself when the district court refused to appoint replacement counsel.

The final factor is whether the defendant was trying to manipulate the proceedings. We have observed that "[e]vidence of manipulation or intentional delay implies a greater understanding of the proceedings and an understanding of the risks and complexities of a criminal trial." *Fitzpatrick*, 800 F.2d at 1067. The record reflects that Owen sought to intentionally delay the proceedings by claiming that he needed a continuance to gather more records to support his defense that he lacked the requisite intent because Hawk directed his actions. Given Owen's later admission that Hawk never knew about his actions, however, he would have known that there were no records that would establish Hawk's knowledge. A reasonable inference to be drawn from these facts is that Owen sought to delay the proceedings, meaning this factor weighs against him.

In summary, at best only one *Stanley* factor—the availability of standby counsel—potentially counts in Owen's favor. Even assuming that this factor weighs in Owen's favor, we cannot say that the district court erred in permitting him to represent himself. *See Stanley*, 739 F.3d at 648 (explaining that a defendant's waiver of counsel may be knowing and voluntary even when some of

the factors weigh in his favor).  Because the record reflects that Owen understood

the risks of self-representation and freely chose to face them, we conclude that his

waiver of counsel was knowing and voluntary.

**B.      The Challenge to the District Court's Orders Directing that Owen's Funds Be Paid to Reimburse His Appointed Counsel's Fees and Expenses**

On appeal, Owen also challenges the series of orders in which the district

court directed a county sheriff to pay money from Owen's jail account into the

court's registry and later ordered that the funds held in the registry not be returned

to Owen but instead paid to the Treasury to cover some of the fees of Owen's

appointed counsel.  First, Owen argues that the district court erred when it initially

seized his money because the court failed to make the appropriate inquiry required

by the CJA, 18 U.S.C. § 3006A, before seizing the money.  Because the district

court gave Owen notice and an opportunity to be heard before directing that the

funds be paid to the Treasury, however, any error that the district court made was

harmless.  Second, Owen argues that the district court erred when it later refused to

return the funds to him and instead directed that the money be paid to the Treasury

because he received the money as Social Security benefit payments.  But we lack

jurisdiction to consider Owen's challenge to the district court's administrative

determination that he failed to establish that the money deposited in his jail

23

accounts originated as Social Security benefits and had not been commingled with other funds.

Before addressing Owen's arguments, we review the law governing the appointment of counsel under the CJA and, specifically, when a court may order that a defendant's funds be used to reimburse appointed counsel. The CJA establishes procedures for the appointment of counsel for criminal defendants. *See* 18 U.S.C. § 3006A. When the court is "satisfied after appropriate inquiry" that a defendant "is financially unable to obtain counsel," the CJA requires the court to appoint counsel to represent her. *Id.* § 3006A(b). The statute also addresses how appointed attorneys are compensated for their work, explaining that the attorney must submit a claim for compensation and reimbursement to the court, which then determines the amount the attorney will be paid. *Id.* § 3006A(d)(5).

If the court later finds that the defendant "is financially able to obtain counsel or to make partial payment for the representation," the CJA provides that the court "may terminate the appointment of counsel or authorize payment as provided in subsection (f), as the interests of justice may dictate." *Id.* § 3006A(c). Subsection (f) in turn provides that if the court finds that "funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct" that the funds be paid "to the court for deposit in the Treasury as a reimbursement." *Id.* § 3006A(f).

Under the CJA, we have limited jurisdiction to review a district court's payment order directing that funds available to a defendant be paid to the Treasury to reimburse the fees and expenses of an appointed attorney. *See United States v. Griggs*, 240 F.3d 974, 974 (11th Cir. 2001). In *Griggs*, a criminal defendant who had been represented by a court-appointed lawyer retained an attorney to represent him in his criminal proceedings. *Id.* The district court later ordered, under § 3006A(f), that the retained attorney pay the fee she received from the client into the court's CJA fund. *Id.* When the attorney appealed the district court's order, we determined that we lacked jurisdiction to review the merits of her appeal. *Id.*

We held that the district court's determination under § 3006A(f) that money should be paid into the court's registry to cover the cost of the defendant's appointed counsel was administrative in nature and not subject to appeal as a final decision. *Id.* We explained that (1) the CJA did not provide for appeals of payment orders under § 3006A(f); (2) district courts are vested with discretion to issue a payment order; (3) payment order determinations are made in an administrative setting rather than an adversarial posture; (4) payment orders are unrelated to the outcome of the case; and (5) a district court does not have to hold an adversarial hearing before entering a payment order.[8] *Id.*

---

[8] In *Griggs*, we relied heavily on the reasoning in an earlier decision holding that a district court's § 3006A(d) fee determination is administrative in nature and not subject to appeal

25

Although *Griggs* established that we generally lack jurisdiction to review a district court's § 3006A(f) payment order, a narrow exception to this rule allows us to consider whether a district court complied with the procedural requirements of § 3006A before entering an order directing that the defendant's money be paid over to the Treasury to reimburse the fees and expenses of appointed counsel. *See United States v. Bursey*, 515 F.2d 1228 (5th Cir. 1975).[9]  In *Bursey*, when a criminal defendant who was represented by appointed counsel appealed his drug conviction, he posted a bond to secure his release pending appeal. *Id.* at 1231.  To secure the bond, he deposited $1,000 into the court's registry with the instruction that upon disposition of the case the deposit should be repaid to his parents. *Id.* After the defendant prevailed on appeal, the district court—without providing notice to the defendant or his parents—transmitted the deposited funds to the Administrative Office for the United States Courts so that the money could be used to reimburse the Treasury for the fees and expenses of the defendant's appointed counsel. *Id.*

On appeal, our predecessor court considered whether § 3006A authorized the district court to direct that the funds paid to secure the defendant's bond be

---

as a final decision. *See Griggs*, 240 F.3d at 974 (citing *United States v. Rodriguez*, 833 F.2d 1536, 1537 (11th Cir. 1987)).

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

used to reimburse his appointed counsel. *Id.* at 1235. Looking to the text of § 3006A, the court explained that a finding that "funds are available from or on behalf of" a defendant under subsection (f) "must be predicated upon an appropriate inquiry." *Id.* at 1236 (internal quotation marks omitted). Because the district court failed to provide the defendant or his parents with "notice . . . of the anticipated disbursement and an opportunity . . . to present their objections thereto" before paying the money to the Treasury, the court concluded that the district court erred. *Id.* at 1238.

With this background in mind, we consider Owen's first argument, that "§ 3006A and *Bursey* require[d] an appropriate inquiry *before* the funds [were] disbursed to the registry of the [c]ourt." Appellant's Br. at 29. Owen's argument rests on § 3006A and *Bursey*. *Bursey* never addressed whether § 3006A requires a district court to give a defendant notice and an opportunity to be heard before ordering the defendant's funds to be paid into the court's registry. Because the funds were already in the court's registry, *Bursey* simply held that the court erred in directing the money to the Treasury to cover the cost of appointed counsel without providing notice and opportunity to be heard. *See* 515 F.2d at 1231, 1238-39. The text of § 3006A(f), which states that the district court may direct the payment of funds "to the court for deposit in the Treasury" "[w]henever [it] finds that funds are available for payment," suggests that the procedural protections must

27

occur before the court directs the payment of funds to the court. But we need not decide whether the district court erred in failing to provide Owen with notice and an opportunity to be heard before seizing his funds because there is no question that the district court satisfied this requirement before the money was disbursed to the Treasury. The district court informed Owen of its intention to pay the money to the Treasury, allowed him to present argument against the payment, and gave him several opportunities to submit evidence to support his arguments. And Owen has not identified any harm he suffered because of the timing of the hearing. By giving Owen notice and an opportunity to be heard before paying the money out of the court's registry, any error that the district court made was harmless.[10]

We turn to Owen's second argument, that the district court erred in denying his motion to return his money paid into the court's registry because it represented his Social Security benefits. Owen's challenge goes to the merits of the district court's decision under § 3006A(f) that the registry funds, which were seized from Owen's jail account, were funds "available for payment from or on behalf of a person furnished representation." 18 U.S.C. § 3006A(f). Under our precedent in

---

[10] Owen's argument that the district court failed to afford him the procedures guaranteed by § 3006A resembles a constitutional due process argument; however, Owen has conceded that he raised no argument on appeal that the district court's orders violated his due process rights. He therefore has abandoned any constitutional challenge to the district court's seizure and disbursement of the funds. *See United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003). We caution that we express no opinion about whether the district court violated Owen's constitutional right to due process when it seized money from his jail account without providing him any notice or opportunity to be heard before the seizure.

28

*Griggs*, we lack jurisdiction to review the merits of this decision. We therefore dismiss this part of the appeal.

In an apparent attempt to sidestep *Griggs*, Owen reframes his argument on appeal, asserting that his motion seeking the return of funds was a "Rule 41(g) motion," Appellant's Br. at 30, even though the motion did not reference the rule. Federal Rule of Criminal Procedure 41, which addresses searches and seizures, establishes procedures for law enforcement officers to obtain a warrant when "there is probable cause to search for and seize a person or property." Fed. R. Crim. P. 41(d)(1). Under Rule 41(g), a person "aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." Fed. R. Crim. P. 41(g). When a property owner "invokes Rule 41(g) after the close of all criminal proceedings, the court treats the motion for return of property as a civil action in equity." *United States v. Howell*, 425 F.3d 971, 974 (11th Cir. 2005).

We are unconvinced that a defendant can use Rule 41(g) as a backdoor to challenge a district court's administrative determination, made pursuant to § 3006A(f), that funds available to the defendant should be paid over to the Treasury to reimburse some or all of the fees or expenses of the defendant's appointed counsel. After all, Rule 41 addresses searches and seizures by law enforcement officials in connection with the investigation of a crime. *See* Fed. R.

Crim. P. 41(d)(1); *see also Okoro v. Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003)

(explaining that Rule 41(g) "entitles a person to the return of his property that has

been unlawfully seized by a federal law enforcement officer").  And Owen cites no

authority establishing that a defendant can use Rule 41(g) to secure appellate

review of a district court's administrative payment order directing that funds

available to a defendant should be paid to the Treasury to reimburse the fees and

expenses of his court-appointed counsel.[11]  We thus conclude that we lack

jurisdiction to review Owen's challenge to the district court's payment order.

## III.   CONCLUSION

For the above reasons,[12] we affirm Owen's convictions.  Regarding Owen's

challenges to the district court's orders relating to the use of funds from his jail

---

[11] Indeed, all our cases addressing Rule 41(g)—or its predecessor, Rule 41(e)—arose in circumstances where a defendant sought return of property that had been seized as part of a criminal investigation.  *See United States v. Machado*, 465 F.3d 1301, 1304, 1307 (11th Cir. 2006) (seeking return of property seized in connection with defendant's money laundering scheme), *overruled on other grounds by United States v. Lopez*, 562 F.3d 1309, 1311 (11th Cir. 2009); *United States v. Potes Ramirez*, 260 F.3d 1310, 1312 (11th Cir. 2001) (seeking return of identification and other papers seized when defendant was arrested for importing cocaine); *United States v. Martinez*, 241 F.3d 1329, 1329-30 (11th Cir. 2001) (seeking return of car, gun, and personal effects that were seized when defendant was arrested for a federal drug-related offense).

[12] The government argues that we should dismiss Owen's appeal because in the plea agreement he waived his right to appeal his convictions and sentence.  Owen responds that the appeal waiver in the plea agreement barred neither his *Faretta* claim nor his claim that the district court erred in taking money from his jail account to reimburse the Treasury for the fees and expenses of his appointed counsel.  We need not decide whether the appeal waiver term in the plea agreement barred either of Owen's challenges because even if we assume the plea agreement did not bar the appeal, Owen is entitled to no relief.

account to reimburse the fees and expenses of his appointed counsel, we affirm in part and dismiss in part.  To the extent that Owen challenges the district court's orders on the basis that the district court failed to afford him the procedures set forth in the CJA, we affirm.  But to the extent that Owen challenges the merits of the district court's decision to pay the funds in the court's registry to the Treasury, we dismiss this portion of the appeal for lack of jurisdiction.

**AFFIRMED IN PART AND DISMISSED IN PART.**