[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 23-13692

Non-Argument Calendar

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

PATRICK E. LONGSWORTH,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:23-cr-20017-RAR-1

————————————————

Before JORDAN, ROSENBAUM, and LAGOA, Circuit Judges.

PER CURIAM:

Patrick Longsworth appeals his convictions for aiming a laser pointer at Coast Guard and police helicopters flying over his home.  He contends that the district court committed structural error by permitting him to represent himself at trial, despite indications of "severe mental illness."  After careful review of the record, we agree with the district court that Longsworth knowingly and voluntarily waived his right to counsel, so we affirm his convictions.

## I.

Longsworth was charged by indictment with three counts of aiming a laser pointer at an aircraft, which each carried a maximum term of five years' imprisonment.  *See* 18 U.S.C. § 39A.

### A.  *Conflicts with Appointed Counsel*

Early on, the government offered Longsworth a way to resolve the case without conviction.  Namely, he could agree to participate in a pretrial-diversion program, which would not require him to admit guilt or spend any time in jail, and the case would be dropped so long as he met certain requirements, including drug testing and community service.

But Longsworth resisted the offer, leading to conflict with his court-appointed attorneys.  Over the course of three status hearings on these matters, Longsworth offered various and not

altogether consistent reasons for insisting on going to trial, including that (a) he "might as well go to prison" rather than participate in the diversion program "amongst people that I despise"; (b) video or audio evidence was missing or had been altered; (c) he needed to protect his daughters at his home in a "very dangerous" neighborhood; (d) he wanted to do all he could to stay out of jail; (e) he was concerned about drug testing, despite saying he did not use drugs; and (f) he had transportation issues with regard to doing community service.

At the status hearings, the district court questioned Longsworth about his reasons for rejecting the pretrial-diversion offer, and it explained at length and in extensive detail the respective burdens and risks of the diversion program versus trial, with specific emphasis on Longsworth's sticking points. Still, Longsworth resisted and insisted on going to trial, despite claiming he understood the risks involved. That prompted the court to tell him that his position made "literally zero sense" and was not "rational," and that it was "worried, a little bit, about your competency." Nevertheless, the court made clear that it was ultimately Longsworth's decision whether to go to trial.

The district court appointed substitute counsel after the first hearing, citing a breakdown in communications, but to no avail. Longsworth again asked for a new lawyer at the second hearing. The court denied the motion, admonishing Longsworth for "jerk[ing] everyone around," and explaining that he could work with his court-appointed attorney, whether by going to trial or

entertaining some form of plea, or he could represent himself. Longsworth indicated he wished to retain a private attorney, and the court gave him one week to do so, but it warned that no further extensions or continuances would be granted. The court denied Longsworth's extension motion filed one week later.

Then, at the third hearing, the district court addressed appointed counsel's motion to withdraw based on irreconcilable differences. Longsworth maintained that some video or audio discovery remained missing, or had been altered, relating to communications between the aircraft and Opa-Locka Airport. The government confirmed that no such video or audio evidence existed. The court found no grounds to appoint substitute counsel at government expense. The court explained that, if Longsworth wished to proceed with discharging counsel, the court would treat that decision "as an exercise of [his] right of self-representation," meaning he "will be representing [him]self." Longworth confirmed that he wanted to discharge counsel, which the court treated as an "unequivocal request for self-representation."

## B. The Faretta Inquiry

At that point, the district court put Longsworth under oath to conduct a *Faretta*[1] inquiry. In response to direct questioning from the court, Longsworth affirmed that he had never studied law or represented himself in a criminal trial. The court explained the benefits of proceeding to trial with counsel, and Longsworth

---

[1] *Faretta v. California*, 422 U.S. 806 (1975).

confirmed that he understood.  The government explained the nature of the charges in the indictment.  The court also confirmed that Longsworth understood that each offense carried a potential sentence of five years' imprisonment, one year of supervised release, up to a $250,000 fine, and a $100 special assessment.

Next, Longsworth affirmed that he understood that (1) apart from the penalties listed in the indictment, the advisory sentencing guidelines could impact his sentence; (2) the court could not assist him at trial if he proceeded *pro se*; (3) he must abide by the Federal Rules of Evidence, which govern what evidence may be introduced at trial; and (4) he must abide by the Federal Rules of Criminal Procedure, which govern the way a criminal action is tried.  Longsworth was not familiar with the Federal Rules, but he confirmed his understanding that he would be bound by them at trial.  Longsworth also confirmed that he had not only read and understood the charges against him, but also discussed them with his former attorneys.

In response to further questioning from the district court, Longsworth affirmed that (1) he was 69 years old; (2) he could read but could not write very well; (3) he did not have trouble understanding English; (4) he completed the eleventh grade; (5) he was not then under the influence of alcohol or drugs; (6) he had never been diagnosed or treated for any mental illness; (7) he had no physical problems that prevented him from representing himself; and (8) no one threatened him to prevent him from hiring a lawyer or accepting court-appointed counsel.

Finally, Longsworth affirmed that, after being advised of his "right to counsel, the advantages of having counsel, the disadvantages and dangers of proceeding without counsel, the nature of the charges, and the possible consequences in the event of a conviction," he still wished to discharge appointed counsel. At that point, the district court found that Longsworth was competent to represent himself, and Longsworth confirmed that he understood that he would have to defend himself, without the assistance of a lawyer, if he did not retain private counsel before the start of the trial.

The district court then said that, in its opinion, it was "very unwise" for Longsworth to represent himself—because he was unfamiliar with the law, the Rules of Criminal Procedure, and the Rules of Evidence—and "strongly urge[d]" Longsworth not to proceed *pro se*, advising that an attorney would defend him "far better than you could defend yourself." Still, the court found that Longsworth had knowingly and voluntarily waived his right to counsel, and it permitted Longsworth to represent himself—with prior appointed counsel serving as stand-by counsel. But the court made clear that counsel would provide assistance only at Longsworth's request—or if Longsworth proved incapable of representing himself.

## C. *Trial and Sentencing*

Longsworth represented himself at the two-day trial and was convicted on all three counts. During jury selection, Longsworth did not make any peremptory strikes or ask any questions

of potential jurors.  Then, during trial, Longsworth did not make an opening statement or closing argument, raise any evidentiary objection, call any witnesses, or testify in his defense, and he engaged in minimal and largely irrelevant cross-examination.  Among other evidence, the government presented video evidence in which Longsworth admitted aiming lasers at the Coast Guard and police helicopters, because he did not want them flying over his house.

Post-trial, Longsworth retained counsel, who moved for a competency hearing under 18 U.S.C. § 4241.  The district court addressed—and ultimately denied—the motion at Longsworth's sentencing hearing.  In ruling on the motion, the court said that it had found Longsworth competent to stand trial after a thorough *Faretta* inquiry, and that it would have *sua sponte* ordered a competency evaluation had Longsworth exhibited any truly irrational behavior.  Still, the court commented that Longsworth's decision to turn down the government's offer—and risk going to jail—signaled that he suffered from "some paranoia and mental illness."  But in the court's view, Longsworth was always respectful, responsive, and "understood what was going on" in his interactions with the court.

The district court sentenced Longsworth to 24 months' imprisonment for each count, to be served concurrently.  The court cited Longsworth's mental state as a mitigating factor when it varied his sentence downward from the guideline range.  This appeal followed.

**II.**

Longsworth appeals, through counsel, arguing that the district court erred in finding that he was competent to represent himself at trial and allowing him to proceed *pro se*. He maintains that his unwillingness to communicate with counsel or accept the government's offer of pretrial diversion stemmed from paranoid delusions caused by severe mental illness, and that the court should have known he was incapable of self-representation. He asserts that this amounts to structural error, requiring reversal of his convictions. He does not challenge the district court's finding that he was otherwise competent to stand trial.

We review *de novo*, as a mixed question of law and fact, a district court's conclusion that a defendant has waived his right to counsel. *United States v. Hakim*, 30 F.4th 1310, 1318 (11th Cir. 2022). On appeal, it is the government's burden to show the validity of the waiver. *United States v. Cash*, 47 F.3d 1083, 1088 (11th Cir. 1995).

As the Supreme Court has explained, the Sixth Amendment protects not only the right to counsel in criminal cases, but "grants to the accused personally the right to make his defense." *Faretta v. California*, 422 U.S. 806, 819 (1975). "To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment." *Id.* at 820. Accordingly, a criminal defendant has a "constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so." *Id.* at 807.

*Faretta* protects the "right to self-representation despite the possible downsides." *United States v. Muho*, 978 F.3d 1212, 1218

(11th Cir. 2020). Thus, while "[i]s undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts," the defendant "must be free personally to decide whether in his particular case counsel is to his advantage." *Faretta*, 422 U.S. at 834. So while a defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored out of that respect for the individual which is the lifeblood of the law." *Id.* (quotation marks omitted).

To represent himself, the defendant must "knowingly and intelligently waive his right to counsel." *Hakim*, 30 F.4th at 1322 (quotation marks omitted). To make that determination, the court generally should conduct a hearing, known as a *Faretta* inquiry, "to determine whether the defendant understands the risks of self-representation." *United States v. Owen*, 963 F.3d 1040, 1049 (11th Cir. 2020) (quotation marks omitted). A valid waiver can occur "not only when a cooperative defendant affirmatively invokes his right to self-representation, but also when an uncooperative defendant rejects the only counsel to which he is constitutionally entitled, understanding his only alternative is self-representation with its many attendant dangers." *United States v. Garey*, 540 F.3d 1253, 1265 (11th Cir. 2008) (*en banc*). The question is whether the defendant's words and actions "reveal a voluntary decision to choose the path of self-representation over the continued assistance of counsel." *Id.* at 1266.

We have outlined eight factors relevant to the determination of "whether a defendant's waiver of his right to counsel was knowing and voluntary":

> (1) the defendant's age, educational background, and physical and mental health; (2) the extent of the defendant's contact with lawyers prior to trial; (3) the defendant's knowledge of the nature of the charges, possible defenses, and penalties; (4) the defendant's understanding of rules of procedure, evidence, and courtroom decorum; (5) the defendant's experience in criminal trials; (6) whether standby counsel was appointed, and the extent to which that counsel aided the defendant; (7) mistreatment or coercion of the defendant; and (8) whether the defendant was trying to manipulate the events of the trial.

*Owen*, 963 F.3d at 1049. "A defendant's waiver may be valid even when some of these factors weigh in his favor." *Id.*

Longsworth argues that his waiver of counsel was not knowing and voluntary because he lacked important legal knowledge and he was "too severely mentally ill to conduct a trial." He contends that his conduct and comments manifested "several mental delusions and paranoia," leading to breakdowns in communication with his attorneys and his irrational rejection of the government's pretrial diversion offer. He also contends that the court improperly equated his competency to stand trial, which he does not dispute, with his competency to represent himself at trial.

Here, the record establishes that Longsworth knowingly and intelligently waived his right to counsel. For starters, we reject Longsworth's claim that the court applied an incorrect standard. Even assuming the court, in its comments at sentencing, conflated the test for determining a defendant's competency to stand trial with the competency to represent oneself, the record shows that the court conducted a proper *Faretta* inquiry before allowing Longsworth to waive his right to counsel. *See Owen*, 963 F.3d at 1049. Plus, our review is *de novo* based on what the record reveals, so our decision is not influenced by any alleged error in that regard. *See Hakim*, 30 F.4th at 1318. "As long as the record establishes that the defendant understood the risks of self-representation and freely chose to face them, the waiver may be valid." *Owen*, 963 F.3d at 1049 (quotation marks omitted).

Turning to the validity of the waiver, we have carefully reviewed the record, and we conclude that most of the factors support the district court's finding of a valid waiver. Nothing about Longsworth's age (then 69), educational background (eleventh grade), or physical health suggests he was incapable of making a knowing waiver. *See Kimball*, 291 F.3d at 731. He appears to have had ample contact with his court-appointed attorneys before trial, confirming that he had discussed with them the nature of the charges, the discovery materials, and the government's diversion offer. The record also shows that Longsworth spoke with a probation officer regarding the diversion program during the first hearing. Plus, standby counsel was present throughout the trial, even

if he was not asked to assist.  And we see no indication of any coercion or manipulation.

Although Longsworth did not have any legal background or relevant prior experience, "[t]he purpose of a *Faretta* inquiry is not to determine the extent of a defendant's legal knowledge or to determine how good of a trial advocate a defendant will be."  *Kimball*, 291 F.3d at 731; *see Faretta*, 422 U.S. at 836 (stating that a defendant's "technical legal knowledge" is "not relevant to an assessment of his knowing exercise of the right to defend himself").  "Instead, we need only to determine whether [Longsworth] understood that rules do exist to govern the procedure of a trial, the introduction of evidence and the behavior of advocates and to determine whether [Longsworth] understood that he would be bound by those rules."  *Kimball*, 291 F.3d at 731.  The district court's colloquy with Longsworth shows just that.  In response to the court's questions, Longsworth confirmed his understanding that he must abide by the Federal Rules of Evidence, which govern what evidence may be introduced at trial, and the Federal Rules of Criminal Procedure, which govern the way a criminal action is tried.

The record also shows that the district court did all that it believed it reasonably could have done under the circumstances to impress upon Longsworth the consequences of going to trial without counsel.  The court explained that each offense carried a potential sentence of five years' imprisonment, one year of supervised release, up to a $250,000 fine, and a $100 special assessment, and Longsworth said he understood.  The court also recounted the

various ways in which a lawyer could help at trial.  And it stressed that, in its opinion, it was "very unwise" for Longsworth to represent himself—because he was unfamiliar with the law, the rules of criminal procedure, and the rules of evidence—and "strongly urge[d]" Longsworth not to proceed *pro se*, stating that a trained lawyer "would defend you far better than you could defend yourself."  Longsworth repeatedly stated that he understood what the district court was saying and, despite all that, he desired to represent himself at trial if he was unable to obtain counsel of his choice.

The one factor that gives us pause is Longsworth's mental health.  Longsworth appears to have been under a mistaken belief that the government and his court-appointed attorneys were withholding video evidence from him, and his reasons for declining the government's offer of pretrial diversion were shifting and difficult to comprehend.  He said he wanted a new attorney so he could stay out of jail, though the diversion offer would ensure that result.  He did not want to be "amongst people that I despise" in the diversion program, when prison was unlikely to be better in that regard.  He wanted to protect his daughters from a "very dangerous" neighborhood, though he now indicates his daughters are adults in no need of protection.  He expressed concern about drug testing but said he did not use drugs.  And he cited transportation issues, despite assurances he could do community service at home.  What's more, Longsworth appears to have had no viable defense to the charges, given video evidence of him admitting to aiming a laser pointer at the helicopters in an effort to prevent them from flying over his house.  So Longsworth's rejection of his court-appointed

attorneys and the pretrial-diversion offer can hardly be described as rational or logical.

But importantly, *Faretta* protects the "right to self-representation despite the possible downsides." *Muho*, 978 F.3d at 1218. The court could not simply force Longsworth to accept the diversion offer, even if it was in his best interests. And there is no other indication in the record that Longsworth, contrary to his repeated representations to the court, was unable to or did not understand the risks and consequences of his choices, including self-representation. There is no evidence that Longsworth had been diagnosed or treated for any mental illness, and the court was able to assess his demeanor and comprehension through several hearings and at trial. Plus, as we noted above, Longsworth does not challenge his general competency to stand trial, or to make choices about whether to go to trial. Thus, while Longsworth's motivations remain somewhat of a mystery, we cannot say that these matters fatally undermine the validity of his otherwise clear and express waiver.

For these reasons, and given all the circumstances, we agree with the district court that Longsworth's waiver of his right to counsel in this case was knowing and voluntary.

**AFFIRMED.**