[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-11970

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SALEEM HAKIM,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:18-cr-00126-MLB-AJB-1

_____

Before WILLIAM PRYOR, Chief Judge, GRANT, and ANDERSON, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal concerns whether a defendant's waiver of his right to counsel, U.S. CONST. amend. VI, is knowing when a court gives materially incorrect or misleading information about his potential maximum sentence. A jury found Saleem Hakim guilty as charged on three misdemeanor counts of willful failure to file a federal income tax return. *See* 26 U.S.C. § 7203. Although Hakim was represented by counsel at trial, he lacked representation during the pretrial process. At his arraignment, Hakim expressed his desire to waive his right to counsel and to represent himself. The magistrate judge found that Hakim's waiver was knowing after misinforming him that the maximum sentence he could receive if convicted was 12 months of imprisonment. After trial, the district court sentenced Hakim to 21 months of imprisonment. Hakim now argues that his purported waiver of counsel was not knowing. Because the magistrate judge gave materially incorrect information about "the possible punishment he faced, we hold that there was no knowing and intelligent waiver of [Hakim's] right to counsel." *Molignaro v. Smith*, 408 F.2d 795, 796 (5th Cir. 1969) (Wisdom, J.). And because "the defendant need not show prejudice to obtain a reversal," *United States v. Stanley*, 739 F.3d 633, 644 (11th Cir. 2014), we vacate and remand.

## I. BACKGROUND

The United States filed an information charging Saleem Hakim with "willfully fail[ing] to make and file with the Internal Revenue Service . . . an income tax return for each of the calendar years" 2011, 2012, and 2013, despite knowing that "he and his spouse had and received gross income in excess of the minimum filing threshold." At his arraignment, the magistrate judge advised Hakim that he "ha[d] the right to a lawyer" and that the court "would appoint one for [him] free of charge" if he could not afford one. Brian Mendelsohn, the lawyer who would have been appointed to represent Hakim, informed the court that Hakim "wishe[d] to represent himself." After the magistrate judge announced his intention to "appoint and allow Mr. Mendelsohn to represent [Hakim] for purposes solely for [the arraignment]," Hakim "object[ed]," and the magistrate judge proceeded with "Hakim representing himself for purposes of" the arraignment.

The magistrate judge acknowledged that Hakim had an "absolute constitutional right . . . to represent [him]self," but that the law first required that the court "determine[] that [he was] able to make that decision . . . willfully and also with full knowledge of [his] rights in the law." The magistrate judge then asked Hakim a series of questions—"about [his] employment, [his] history, [and his] past"—to make that determination. Hakim responded that he would "remain silent" based on a series of incoherent and frivolous arguments. Hakim asserted that he would "address th[e] matter as the authorized representative for the so-called defendant in the all

caps style Saleem Hakim," but that "this Court hasn't presented anything to [him] that would give [him] any indication that they've got subject matter o[r] personal jurisdiction." He also asserted that he "s[aw] this as being double jeopardy."

The magistrate judge then advised Hakim about the proceedings that lay ahead. He read aloud the information against Hakim and then informed Hakim that "[i]t is a criminal case, a Class A misdemeanor, meaning that it's punishable by a potential term of imprisonment by *up to one year.*" (Emphasis added.) Later during the arraignment, the magistrate judge repeated this advice: "[T]his is again a Class A misdemeanor, so we're not talking about a felony involving imprisonment *beyond one year.*" (Emphasis added.) At no point did the government dispute the veracity of the magistrate judge's advice about the term of imprisonment; it instead supplemented that advice with more information about potential penalties associated with these offenses, such as the maximum fine and supervised release.

The magistrate judge warned Hakim not to represent himself "because of the severity and seriousness of this case and the consequences to [Hakim] if convicted." And after explaining at length the risks and dangers associated with representing himself, the magistrate judge acknowledged that there was "a series of other questions" that "[the Supreme Court] suggests that [he was] to ask [Hakim] in order to make a decision about whether or not [Hakim] [was] in right mind," but "inferr[ed] that's futile here," as

Hakim would deliver "the same speech" involving frivolous and incoherent arguments as before.

After asking Hakim whether it was "still [his] desire at th[at] time to represent [him]self and not accept appointment of Mr. Mendelsohn to represent [him]," Hakim continued his incoherence:

> I am Saleem Naazir, family of Hakim, a living male on the land and soil jurisdiction, as one of the people of the several states, having owner's equity and beneficial interest in the all caps style, Capitis Diminutio Maxima Saleem Naazir Hakim, which is an ens legis aka Saleem N. Hakim, all caps, and aka Saleem Hakim, who is allegedly being charged here as a defendant.

The magistrate judge later said that Hakim would proceed "by way of counsel" unless Hakim "clearly and unequivocally assert[ed] that [he] [was] intending to represent [him]self."

Later, when the magistrate judge said that he would "proceed with Mr. Mendelsohn as appointed for [Hakim]," Hakim responded, "No. I'll make it clear, because I want to object to you appointing counsel. It is my . . . intention[] to handle this matter." The magistrate judge "interpret[ed] [that statement] as [Hakim] clearly and unequivocally stating . . . that" Hakim would represent himself. And Hakim responded affirmatively.

The magistrate judge then "f[ound] that the defendant . . . knowingly and intelligently and voluntarily waiv[ed] his right to

counsel against [the court's] advice." And the magistrate judge appointed Mendelsohn to serve as standby counsel if Hakim later changed his mind. But Hakim asserted that he was not "waiving any rights" because "I'm choosing to operate as a pro per to address this matter regarding this person." The magistrate judge "f[ound] those statements to be an attempt to confuse the record here."

The magistrate judge reiterated his finding that Hakim was knowingly and voluntarily waiving his right to counsel. The magistrate judge found that "[Hakim] is understanding the proceeding and having an intelligent conversation with [the court] about . . . what [Hakim is] facing . . . and making arguments that while meritless . . . reflect an understanding of the court proceeding." "So [the magistrate judge] f[ound] that [Hakim] [was] capable of exercising his constitutional right to represent himself" and entered a plea of not guilty over the same unorthodox objections.

Hakim's dilatory tactics and obscurantism continued more than three months later at his pretrial conference before the district court. Mendelsohn informed the district court that Hakim had sent him a letter the week before "in which he indicated that [Mendelsohn] was fired." Mendelsohn clarified that Hakim was "not interested in any assistance," "ha[d] not taken any [assistance] from [Mendelsohn]," and "that [they] ha[d] basically zero communication." The government represented that "in a prior conversation with [Hakim], a plea offer was brought up . . . but [that] there was no follow-up from [Hakim] after that conversation." The district court then explained to Hakim that pleading guilty "is a mitigating

factor that leads to a reduction in the score under the sentencing guidelines" and that if he desired to avail himself of that benefit, he would have to plead guilty within the next week.

Hakim moved for a continuance because he wanted "the opportunity to seek counsel of [his] own choosing," but the district court found that Hakim was equivocating on the meaning of the word "counsel" and was "not trying to communicate with [the district court]." The district court found that, "in fact, what [Hakim] said was that [he] want[ed] to seek counsel. And when [the district court] asked whether that meant a lawyer, [Hakim] refused to answer that question." Hakim admitted to not speaking with any other lawyer to assist him, and later—after the district judge's herculean efforts to elicit a clear answer—Hakim admitted that he "understand[s] a lawyer to be a member of a bar, which is private, so that's something that [he was] not interested in." Hakim said that he "stipulate[d] to all of the facts" and announced his intention not to "dispute . . . any of the facts" in the case against him. The district court denied the motion to continue based on its findings that Hakim "ha[d] indicated to [the court], quite clearly, [he] d[id] not intend to hire a lawyer," and that he "indicated that [he] [did not] intend to contest anything at trial."

The district court convened another hearing later that month because Hakim represented that he wished "to enter a change of plea." Hakim at first affirmed that he "want[ed] to enter a plea of guilty," and that he came to that decision "on [his] own," without help from Mendelsohn. And the district court confirmed

that there was no plea agreement between Hakim and the government. But it quickly became evident that he would once again attempt to push his unorthodox legal theories. The district court tried to ask Hakim a series of questions to determine whether his plea was knowing and voluntary, but Hakim refused to admit that he was a United States citizen and instead affirmed only that he was "a citizen of Detroit, Michigan, born and raised, in the Michigan republic, which is, from what [he] underst[ood], to be nonfederal." *But see* Definitive Treaty of Peace Between the United States of America and his Britannic Majesty, U.S.-Gr. Brit., arts. I–II, Sept. 3, 1783, 8 Stat. 80; An Act to admit the State of Michigan into the Union, ch. 6, 5 Stat. 144 (1837); U.S. CONST. amend. XIV, § 1. In Hakim's view, the United States is "the ten square mile radius of Washington[,] D.C." *But see* U.S. CONST. art. I, § 8, cl. 17.

But the district court managed to get some relevant information out of him. Hakim was then 49 years old, has some college education, is fluent in English, was not under the influence of any drugs or alcohol, and did not suffer from any mental disability. But things again became muddled when Hakim relied on the usual script and denied that he is "Saleem Hakim."

Hakim represented that he intended to "enter[] a plea on behalf of Saleem Hakim," to whom, he asserted, he is not identical. Hakim stated that he is "a third-party intervener in th[e] matter." When the district court asked Hakim who would be going to prison if a guilty plea were entered, Hakim responded, "[a] piece of paper." At that point, the district court informed him that "the

flesh-and-blood person in front of [the court] could go to prison for up to one year for each of the three counts that [Hakim] would plead guilty to." Hakim responded that he "d[id] not understand that" because he "would be standing as surety for a legal fiction."

The government announced its concerns with accepting any guilty plea based on Hakim's "explicit indication . . . that if the person here were to plead guilty today that a piece of paper would go to jail." After a painstaking attempt to explain to Hakim the nature of the proceedings and the requirements that must be satisfied before the district court could accept Hakim's guilty plea, the district court again put the question to Hakim: "Do you think you want to plead guilty today?" Hakim's answer was unambiguous: "I don't consent[,] and I do not understand." The district court then declined to enter a guilty plea and ordered Hakim to appear for trial.

A few days later, the jury trial began with Hakim representing himself during *voir dire*. After a fourteen-person jury was selected but "[p]rior to the jury being sworn, [Hakim] moved the Court for Mr. Mendelsohn to proceed as attorney of record and for a continuance of the trial." The district court granted Hakim's motion and continued the trial for one week so that Mendelsohn could "effectively prepare for trial." Mendelsohn then participated in the selection of a new jury.

Two days later, the jury returned a guilty verdict. It found Hakim guilty on all three counts charged in the information. After the government sought a sentencing range of 33 to 36 months, the

district court entered a judgment against Hakim on all counts and sentenced him to be imprisoned for a total of 21 months.

Hakim was not represented by a lawyer for four months— almost the entire pretrial phase of the proceedings against him. Hakim was represented from a week before trial until the judgment was entered, five months later. Hakim now argues that he was deprived of his Sixth Amendment right to counsel during critical stages of the process and that this deprivation requires reversal of his conviction.

## II. STANDARD OF REVIEW

Whether a defendant's purported waiver of his right to counsel was knowing is a mixed question of law and fact that we review *de novo*. *United States v. Garey*, 540 F.3d 1253, 1268 (11th Cir. 2008) (en banc). The parties agree that this standard governs this appeal. And because this case comes to us on direct appeal, "the government bears the burden of proving the validity of the waiver." *United States v. Cash*, 47 F.3d 1083, 1088 (11th Cir. 1995).

The dissent argues that we must instead review this appeal for plain error, Dissenting Op. at 1, but that position conflicts with the prevailing view in this Court and our sister circuits. To be sure, some of our decisions raise whether *de novo* or plain-error review applies when the defendant fails to raise the invalidity of the purported waiver in the district court. *E.g.*, *United States v. Owen*, 963 F.3d 1040, 1048 n.5 (11th Cir. 2020). But "the mine run of [Eleventh Circuit] cases apply *de novo* review without discussing whether a

defendant formally objected at trial." *Stanley*, 739 F.3d at 644 (first citing *United States v. Evans*, 478 F.3d 1332, 1340 (11th Cir. 2007), and then citing *Cash*, 47 F.3d at 1088); *see also Garey*, 540 F.3d at 1268; *United States v. Kimball*, 291 F.3d 726, 730 (11th Cir. 2002). "Our sister circuits [have] uniformly appl[ied] a *de novo* standard of review to a district court's conclusion of law that a defendant has waived his right to counsel." *United States v. McBride*, 362 F.3d 360, 365 (6th Cir. 2004) (italics added); *see also United States v. Johnson*, 24 F.4th 590, 600 (6th Cir. 2022) (collecting decisions); *United States v. Hansen*, 929 F.3d 1238, 1248 (10th Cir. 2019); *United States v. Ductan*, 800 F.3d 642, 648 (4th Cir. 2015); *United States v. Erskine*, 355 F.3d 1161, 1166 (9th Cir. 2004). And our sister circuits have reviewed *de novo* the validity of waivers even when the defendant was later represented by counsel in the district court. *See, e.g.*, *Ductan*, 800 F.3d at 646–48; *United States v. Hamett*, 961 F.3d 1249, 1254–55 (10th Cir. 2020). Even if our precedent leaves the question open, we will not disturb that uniformity.

The dissent asserts that a "straightforward application of the federal criminal procedure rules directs us to" review for plain error. Dissenting Op. at 2. The dissent reasons that Hakim's "lawyer took over [Hakim's] representation" and could have timely challenged Hakim's previous waiver at that point, *id.*, months after his waiver. Because Hakim's lawyer failed to object despite having the opportunity to do so, the dissent reasons that plain-error review applies. *Id.* We disagree.

The text of the contemporaneous-objection rule forecloses the dissent's approach. Federal Rule of Criminal Procedure 51(b) governs "how to preserve claims of error." *Puckett v. United States*, 556 U.S. 129, 135 (2009). Rule 51(b) unambiguously requires that the objection be contemporaneous with the relevant ruling or order: "A party may preserve a claim of error by informing the court—*when the court ruling or order is made* . . . —of . . . the party's objection to the court's action and the grounds for that objection." FED. R. CRIM. P. 51(b) (emphasis added). A defendant's "[f]ailure to abide by this contemporaneous-objection rule ordinarily precludes the raising on appeal of the unpreserved claim," unless the "exception to that preclusion" for plain errors in Rule 52(b) applies. *Puckett*, 556 U.S. at 135; *see also* FED. R. CRIM. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). And, if a defendant "does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party." FED. R. CRIM. P. 51(b).

Because an error is considered unpreserved only if a defendant had an opportunity to contemporaneously object and failed to do so, it is irrelevant for purposes of error preservation that Hakim was later represented by counsel. *Contra* Dissenting Op. at 2–4. The relevant ruling—that Hakim knowingly waived his right to counsel—took place four months before Mendelsohn's representation of Hakim at trial. Even if Mendelsohn had challenged Hakim's previous waiver when the representation began, that challenge

would not have been made "when the court ruling or order [was] made." FED. R. CRIM. P. 51(b). No reasonable interpretation of "this *contemporaneous*-objection rule," *Puckett*, 556 U.S. at 135 (emphasis added), would treat an objection months after "the court ruling . . . [was] made," FED. R. CRIM. P. 51(b), as contemporaneous with that ruling. *See Contemporaneous*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Living, occurring, or existing at the same time."). Because Mendelsohn lacked an opportunity to contemporaneously object, the only question is whether Hakim himself had an opportunity to contemporaneously object to the validity of his own waiver when he was unrepresented.

Hakim was not obliged to contemporaneously object to the validity of his own waiver because—as the dissent concedes, Dissenting Op. at 3—he lacked "an opportunity to object to [that] ruling." FED. R. CRIM. P. 51(b). It makes no sense to suppose that a defendant must have enough knowledge to object *before* he is advised of the dangers of proceeding without the assistance of counsel. *See Erskine*, 355 F.3d at 1166 ("[The] requirements for reviewing the validity of a *Faretta* waiver are predicated on the fact that we do not expect pro se defendants to know the perils of self-representation, and consequently, we cannot expect defendants to recognize that they have not been correctly and fully advised, let alone to point out the court's errors."); *Johnson*, 24 F.4th at 601 ("It would be nonsensical to require that a prospective *pro se* defendant object to the district court's inquiry into the defendant's rationale and ability to proceeding *pro se*."). "To preserve the issue,

defendants would have to recognize their own inability to represent themselves and object to their own request to proceed *pro se.*" *Johnson*, 24 F.4th at 601. And because Hakim "d[id] not have an opportunity to object to [the relevant] ruling or order" "when th[at] . . . ruling or order [was] made," "the absence of an objection [could] not later prejudice" Hakim, FED. R. CRIM. P. 51(b), by requiring him to establish a plain error, *see* FED. R. CRIM. P. 52(b).

We have rejected reviewing an appeal for plain error when a *pro se* defendant failed to contemporaneously object to the validity of his own waiver. In *United States v. Ly*, a defendant represented himself at trial and "was unaware that he could testify in narrative form." 646 F.3d 1307, 1311 (11th Cir. 2011). Because he falsely believed that he would need counsel to question him, he waived his right to testify. *Id.* at 1311–12. On appeal, the defendant "argue[d] that the district court denied him his right to testify by failing to correct his misunderstanding regarding the availability of narrative testimony." *Id.* at 1312. "The [g]overnment contend[ed] that plain-error review must apply because [the defendant] never objected to the district court's alleged denial of his right to testify." *Id.* at 1312 n.5. We rejected that "absurd" argument. *Id.* "By definition, [the defendant] could not have objected to the district court's actions, for his claim lies in his ignorance of the law." *Id.* In that circumstance, we held that the "contemporaneous-objection requirement" did not apply. *Id.* Likewise, the plain-error "exception" in Rule 52(b) to the contemporaneous-objection requirement in Rule 51(b), *Puckett*, 556 U.S. at 135, does not apply here because

Hakim lacked an opportunity to contemporaneously object to the magistrate judge's ruling, *see* FED. R. CRIM. P. 51(b), "for his claim lies in his ignorance of the law," *Ly*, 646 F.3d at 1312 n.5.

The dissent relies on *United States v. Davila*, 749 F.3d 982 (11th Cir. 2014), and *United States v. Margarita Garcia*, 906 F.3d 1255 (11th Cir. 2018), for its position that the contemporaneous-objection rule does not require a contemporaneous objection, Dissenting Op. at 3–5, but neither decision requires that we depart from the text of Rule 51(b). In both cases, the defendants had opportunities to contemporaneously object to the relevant rulings.

In *Davila*, the defendant argued "for the first time on appeal" that a "[m]agistrate [j]udge's comments during a pre-plea hearing constituted improper judicial participation in plea discussions." 749 F.3d at 984. After the magistrate judge's comments, the district court twice ruled that the defendant's guilty plea was valid with no objection from the defendant to the magistrate judge's previous comments. *Id.* at 989–90. So, the defendant had two opportunities to contemporaneously object to rulings about the validity of his guilty plea, and he failed both times to do so. 749 F.3d at 989–90. It follows that our holding in *Davila* that the defendant's "case d[id] not warrant departure from the rule that plain-error review applies when a defendant fails to contemporaneously object to trial error," *id.* at 993, accords with our holding here that no objection months after the magistrate judge's ruling could have been contemporaneous.

The dissent's reliance on *Margarita Garcia* suffers from the same problem. In *Margarita Garcia*, we applied plain-error review after a defendant's counsel failed to object to the admission of inculpatory testimony when both defense counsel and the defendant were absent. 906 F.3d at 1262–63, 1268–69. Defense counsel "returned to the courtroom at some point during the government's direct examination and while [the defendant] was still absent," but "no objection was made at any point during [the] testimony, either upon defense counsel's return or [the defendant's] appearance." *Id.* at 1268. The next day, the prosecutor "bluntly asked defense counsel" whether she was "going to state an objection," and defense counsel stated, "[n]ot at this time, no." *Id.* at 1269. The events of the next day made "clear[] that counsel deliberately chose to say nothing and raise no objection." *Id.* And we expressly rejected the argument that a later "mo[tion] for a new trial" was sufficient "to preserve her objection" because Rule 51(b) "*unambiguously* requires parties to object 'when the court ruling or order is made or sought' in order to properly preserve claims of error." *Id.* at 1269 (emphasis added) (quoting FED. R. CRIM. P. 51(b)). Defense counsel in *Margarita Garcia*—unlike Mendelsohn—had an opportunity to "contemporaneously object[]" and "conscious[ly] fail[ed]" to do so. *Id.* at 1266, 1269. So, *Margarita Garcia* does not require that we depart from the text of Rule 51(b) by holding that an objection four months after the relevant ruling would have satisfied the contemporaneous-objection requirement.

Our sister circuits have adopted the unambiguous meaning of Rule 51(b) that we adopt here: when a defendant lacks an opportunity to contemporaneously object to "the district court's ruling," he cannot "forfeit[] his assertion of error." *United States v. Burrell*, 622 F.3d 961, 965 (8th Cir. 2010). "The 'opportunity to object' language would be meaningless if the mere ability to file a motion for reconsideration qualified as an opportunity to object, since a party theoretically could file a later motion for reconsideration of virtually any district court ruling." *Id.* at 966. So, "[r]equiring a motion for reconsideration after the ruling has issued . . . would exceed the . . . requirements of . . . [the] contemporaneous-objection rule." *Id.* (internal quotation marks omitted); *accord United States v. Smith*, 640 F.3d 580, 586 (4th Cir. 2011). Because Hakim lacked an opportunity to contemporaneously object, he cannot "later [be] prejudiced," FED. R. CRIM. P. 51(b), by application of Rule 52(b). It follows that, "notwithstanding [Mendelsohn's] decision not to file a motion for reconsideration of the court's ruling[,] . . . plain error review is not appropriate here." *Burrell*, 622 F.3d at 966.

## III. DISCUSSION

We divide our discussion in two parts. First, we consider whether Hakim's purported waiver of his right to counsel was knowing and conclude that it was not. Second, we address whether the deprivation of Hakim's right to counsel constituted a structural error requiring automatic reversal of his conviction and conclude that it did.

### A. Hakim's Waiver Was Not Knowing.

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. "The Sixth Amendment secures to a defendant who faces incarceration the right to counsel at all critical stages of the criminal process." *Iowa v. Tovar*, 541 U.S. 77, 87 (2004) (internal quotation marks omitted). "This right attaches at the pleading stage of the criminal process." *Boyd v. Dutton*, 405 U.S. 1, 2 (1972). But the Supreme Court has held that "forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." *Faretta v. California*, 422 U.S. 806, 817 (1975). "[T]he right to self-representation—to make one's own defense personally—is . . . necessarily implied by the structure of the [Sixth] Amendment." *Id.* at 819. So, "[t]he Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Id.*

Because the constitutional rights to counsel and to self-representation cannot be exercised at once, a defendant can exercise one only if he waives the other. It follows that, "[w]hen an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel." *Id.* at 835. "For this reason, in order to represent himself, the accused must knowingly and intelligently" waive his right to counsel. *Id.* (internal quotation marks omitted). If the waiver was not made by the accused with the requisite knowledge, then he has been deprived of "the right to counsel" at any "critical stage[] of the

criminal process" at which he lacks a lawyer, including at "[a] plea hearing" and at other pretrial proceedings. *See Tovar*, 541 U.S. at 87 (internal quotation marks omitted); *see also Brewer v. Williams*, 430 U.S. 387, 404 (1977) ("This strict standard applies equally to an alleged waiver of the right to counsel whether at trial or at a critical stage of the pretrial proceedings."). "Because [Hakim] received a [21-month] prison term for his . . . conviction, he had a right to counsel both at the plea stage and at trial . . . ." *Tovar*, 541 U.S. at 87.

At arraignment, Hakim unambiguously expressed to the magistrate judge a desire to waive his right to counsel and to represent himself. *See Raulerson v. Wainwright*, 732 F.2d 803, 808 (11th Cir. 1984) ("Such a knowing waiver must be made by a clear and unequivocal assertion of the right to self-representation." (internal quotation marks omitted)). But the question remains whether Hakim's expressed desire to represent himself was made with the requisite knowledge. This Court has identified the following eight factors that might be useful in making that determination:

> (1) the defendant's age, educational background, and physical and mental health; (2) the extent of the defendant's contact with lawyers prior to trial; (3) the defendant's knowledge of the nature of the charges, possible defenses, and penalties; (4) the defendant's understanding of rules of procedure, evidence, and courtroom decorum; (5) the defendant's experience in criminal trials; (6) whether standby counsel was appointed, and the extent to which that counsel aided

20                    Opinion of the Court                    19-11970

the defendant; (7) mistreatment or coercion of the de-
fendant; and (8) whether the defendant was trying to
manipulate the events of the trial.

*Owen*, 963 F.3d at 1049; *see also Fitzpatrick v. Wainwright*, 800
F.2d 1057, 1065–67 (11th Cir. 1986).

Hakim argues that his attempt to waive his right to counsel
and to exercise his right to self-representation was invalid because
"the trial court affirmatively led [him] astray as to the maximum
penalty he faced." The government concedes that "the magistrate
judge did not expressly tell defendant at the arraignment that he
faced a possible maximum sentence of three years," but argues that
"that is only one part of one of the eight factors this Court considers
when assessing whether a defendant's waiver of his right to counsel
was knowing and voluntary." We agree with Hakim.

The Supreme Court has repeatedly explained that a defend-
ant's waiver is made with the requisite knowledge only if he under-
stands the likely consequences of conviction. "To be valid such
waiver *must* be made with an apprehension of the nature of the
charges, the statutory offenses included within them, [and] *the
range of allowable punishments* thereunder . . . ." *Von Moltke v.
Gillies*, 332 U.S. 708, 724 (1948) (plurality opinion) (emphases
added). And "before a defendant may be allowed to proceed *pro se*,
he *must* be warned specifically of the hazards ahead." *Tovar*, 541
U.S. at 88–89 (emphasis added). *Faretta* itself commands that a de-
fendant "should be made aware of the dangers and disadvantages
of self-representation, so that the record will establish that he

knows what he is doing and his choice is made with eyes open." 422 U.S. at 835 (internal quotation marks omitted). The "dangers," *id.*, of which defendants "must" be made aware include "the relevant circumstances and likely consequences" of conviction. *Brady v. United States*, 397 U.S. 742, 748 (1970). Because "[t]he purpose of the 'knowing and voluntary' inquiry . . . is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision," the defendant "must have a full understanding of what the [decision] connotes and of its consequence." *Godinez v. Moran*, 509 U.S. 389, 401 n.12 (1993) (internal quotation marks omitted).

Our precedents confirm that a defendant must have an awareness of the penal consequences of conviction before his decision to represent himself can constitute a knowing waiver of his Sixth Amendment right to counsel. *See, e.g.*, *Cash*, 47 F.3d at 1088; *Molignaro*, 408 F.2d at 799; *Kimball*, 291 F.3d at 732. In *United States v. Garey*, for example, the en banc Court explained that a waiver is "valid" only if it was "made with an apprehension of . . . the range of allowable punishments" to which the defendant would be exposed if he were convicted. 540 F.3d at 1266 (internal quotation marks omitted). Facts about possible punishments are "essential to a broad understanding of the whole matter." *Id.* (internal quotation marks omitted).

Similarly, in *Molignaro v. Smith*, Judge Wisdom, writing for our predecessor Court, stated that the "duty of the trial judge" is "to be certain that the defendant understands the extent of the

punishment possible." 408 F.2d at 799. There, the defendant "contended that he had not knowingly waived counsel at the time he pleaded guilty, and that his conviction on the basis of that plea had therefore violated the sixth and fourteenth amendments." *Id.* at 797. There was "no evidence at all to indicate that either the prosecution or the state trial judge apprised [him], prior to his plea, of the twenty-year maximum sentence" to which he was exposed. *Id.* at 798. As a result, our predecessor Court set aside the conviction and the sentence. *Id.* at 802. Following other courts, we recognized that "a defendant, before declining an attorney's help, is entitled to know the range of penalty." *Id.* at 800 (internal quotation marks omitted). And we concluded that, "[i]n determining the fairness of allowing a purported waiver of counsel to stand, . . . at the very minimum a defendant must understand not only the nature of the charge but the seriousness of the penalties the law prescribes for the violation." *Id.* (quoting *Stroetz v. Burke*, 268 F. Supp. 912, 917 (E.D. Wis. 1967)).

We need not decide the precision with which defendants generally must know the consequences of conviction because the magistrate judge gave Hakim materially incorrect information about his maximum sentence that rendered his waiver unknowing. "An *important* element of the 'understanding' defendants must possess in order to waive counsel validly is awareness of the possible penalties attaching to the charges they face." *Id.* at 799 (emphasis added). In *Garey*, the en banc Court explained that, when, as here, a court is "confronted with a defendant . . . who refuses to

provide clear answers to questions regarding his Sixth Amendment rights, it is enough for the court to inform the defendant *unambiguously* of the penalties he faces if convicted." 540 F.3d at 1267 (emphasis added). The magistrate judge fell short of that obligation.

The magistrate judge's statements were materially incorrect. Instead of "unambiguously" informing Hakim of the penalties he faced, *id.*, the magistrate judge incorrectly asserted that "we're not talking about a felony involving imprisonment *beyond one year*"—when the true maximum was three times longer. (Emphasis added.) "And we cannot consider the difference between" up to one year imprisonment and three years "immaterial," *see Hamett*, 961 F.3d at 1258 (internal quotation marks omitted), when the actual sentence imposed was significantly higher than the one-year maximum the defendant was told he would face, and when a defendant could sensibly elect to seek representation based on that difference, *cf. Lee v. United States*, 137 S. Ct. 1958, 1966–67 (2017) (explaining that a defendant's decision to go to trial could rationally be based on a difference of two years between the possible maximum sentence and a plea offer). "[I]ndulg[ing]," as we must, "in every reasonable presumption against waiver" of the right to counsel, we cannot conclude that the "strict [waiver] standard" was satisfied here. *See Brewer*, 430 U.S. at 404.

*United States v. Kimball* is instructive. In that decision, we were "troubled by whether [the] [d]efendant understood the consequences of a guilty verdict and what would happen if the trial went badly for him." *Kimball*, 291 F.3d at 731. Our doubts about

whether the defendant adequately understood the consequences of a guilty verdict did not arise from the district court's failure to inform him of the maximum possible sentence; the district court "went through each count and told [him] the maximum sentence under each count." *Id.* at 731–32. And—unlike the magistrate judge here—"the district court informed [the] [d]efendant that the court had the power to sentence him to consecutive sentences." *Id.* at 732. But the district court "did not stop with a warning as to the maximum or theoretical penalties [the] [d]efendant faced." *Id.* The district court went on to "discuss[] with the prosecutor [the] [d]efendant's likely sentence under the federal sentencing guidelines." *Id.* That discussion led to a misleading prediction about his likely sentence. *Id.* "If the district court had simply told [him] the maximum conceivable sentence he faced, th[e] case would [have] be[en] an easy one." *Id.* We concluded that this misleading information did not render the defendant's waiver unknowing because the record established, based on the correct information about his maximum sentence, that he "understood that, if convicted, he could be sentenced to a long[er] prison term" than the prediction suggested. *Id.*

To be sure, giving materially incorrect information about the defendant's sentence does not render his waiver unknowing if the defendant understood correct countervailing information from another source. *See id.* at 731–32. "The ultimate test is not the trial court's express advice, but rather the defendant's understanding," *Stanley*, 739 F.3d at 645 (internal quotation marks omitted), and

giving correct advice to a defendant about possible punishments is "the ideal method" of ensuring that he has that understanding, *see Garey*, 540 F.3d at 1266 (internal quotation marks omitted). But a defendant may also obtain an awareness of the penal consequences of his decision from other sources. *See Jones v. Walker*, 540 F.3d 1277, 1293 (11th Cir. 2008) (en banc) ("So long as a defendant knows the risks associated with self-representation, it is irrelevant for constitutional purposes whether his understanding comes from a colloquy with the trial court, a conversation with his counsel, or his own research or experience."). If a district court gives materially incorrect information about a defendant's sentence, the record must support—directly or inferentially—a finding that the defendant received corrective information, either from the district court or from another source, before his waiver was accepted as valid. *Cf. Stanley*, 739 F.3d at 646 ("[T]he fact that a defendant later became aware of the consequences of his decision may not cure a waiver that was initially unknowing."). Otherwise, we cannot conclude that the waiver was knowing.

The magistrate judge not only failed to inform Hakim of the maximum sentence, but he misled Hakim by incorrectly representing that the maximum term of imprisonment would be one year, when it was instead three years. The magistrate judge's error would not be dispositive if the government could show, consistent with its burden in this context, *see Cash*, 47 F.3d at 1088, that there was *other* evidence in the record to suppose that Hakim knew at the relevant time the correct range from another source, *see*

*Kimball*, 291 F.3d at 731–32; *Owen*, 963 F.3d at 1049. Instead, the evidence suggests the opposite.

Neither the government nor Mendelsohn—Hakim's standby counsel—corrected the magistrate judge's error. How much a defendant interacts with persons learned in the law is relevant to whether the requisite information was conveyed, but no "understanding c[a]me[] from . . . a conversation with his counsel," *Jones*, 540 F.3d at 1293, because Mendelsohn later informed the district court that Hakim received no assistance from him and "that [they] ha[d] basically zero communication." So, we cannot infer that Hakim received corrective information from a lawyer because "the extent of [his] contact with lawyers prior to trial" and "the extent to which [standby] counsel aided" him were minimal. *See Owen*, 963 F.3d at 1049. And the correct understanding of the range of possible punishments did not "come[] from a colloquy with the" magistrate judge, *see Jones*, 540 F.3d at 1293, who twice gave materially incorrect information and gave no accurate countervailing information as in *Kimball*.

When a district court gives a defendant materially incorrect information about his maximum sentence during a *Faretta* colloquy and the record does not establish that the defendant received corrected information, the typical eight-factor analysis cannot be applied, as in this case, to permit a conclusion that the waiver of a defendant like Hakim was knowing. To be sure, as we have explained, some of those factors—such as the extent of contact with lawyers—are relevant to whether a defendant received corrective

information. But if he did not know or receive the correct information, we cannot render his waiver knowing by counting factors. For example, although Hakim's "age, educational background, and physical and mental health," *id.*, permit an inference that he would have understood countervailing information if it had been given, they do not permit an inference that he received that information. An educated and intelligent layman of sound mind can be misled about the maximum penalties he faces. The magistrate judge did not "inform[] [Hakim] that the court had the power to sentence him to consecutive sentences." *Kimball*, 291 F.3d at 732. And because it is the government's burden to establish the validity of the waiver, *Cash*, 47 F.3d at 1088, we cannot speculate for the government that an educated and middle-aged layman would know the difference between consecutive and concurrent sentencing and whether and when either possibly applies, *see Molignaro*, 408 F.2d at 799, 800 n.4 (explaining that "[t]he duty of the trial judge [is] to be certain that the defendant understands the extent of the punishment possible" and suggesting that to do so the trial judge should ensure that the defendant is informed "of the maximum possible sentence on the charge, including that *possible from consecutive sentences*" (emphasis added) (internal quotations omitted)).

Other factors that this Court ordinarily considers when determining whether a defendant understood the consequences of proceeding without a lawyer also cannot render a waiver knowing when a district court gives materially incorrect information about a sentence without correction. To be sure, Hakim was not

"mistreat[ed] or coerc[ed]" and may have been "trying to manipulate" the proceedings with his bizarre theories. *Owen*, 963 F.3d at 1049. But we cannot conclude from those facts that the magistrate judge did not mislead Hakim about his maximum and likely sentence. And even if Hakim had impressive knowledge "of rules of procedure, evidence, and courtroom decorum," *id.*—and his performance suggests the opposite—we would still need evidence that he did not believe the magistrate judge's material misrepresentations.

On this record, we cannot conclude that Hakim's waiver was knowing. It is "incumbent upon the [government] to," *Brewer*, 430 U.S. at 404, "clearly establish[] that" the waiver was knowing, *Brookhart v. Janis*, 384 U.S. 1, 4 (1966). Because we must "indulge in every reasonable presumption against waiver," *Brewer*, 430 U.S. at 404, we must presume that Hakim was misled by the magistrate judge's material misrepresentations about his sentence. And because there is an "absence of a showing that the [defendant] was [correctly] informed [by some source or other] of the possible punishment he faced" after he received materially incorrect information, "we hold that there was no knowing and intelligent waiver of the right to counsel." *See Molignaro*, 408 F.2d at 796.

## B. *The Constitutional Error Was Structural.*

Because Hakim's purported waiver of his Sixth Amendment right to counsel was invalid, we must decide whether Hakim was deprived of "the assistance of counsel during a[ny] critical stage[] of the criminal justice process." *Jones*, 540 F.3d at 1287. As noted,

the Sixth Amendment "secures to a defendant who faces incarceration the right to counsel at" those "stages of the criminal process." *Tovar*, 541 U.S. at 87 (internal quotation marks omitted). And "[i]t is well settled that" that right "applies to certain steps before trial." *Missouri v. Frye*, 566 U.S. 134, 140 (2012). "Critical stages include arraignments, postindictment interrogations, postindictment lineups, and the entry of a guilty plea." *Id.*; *see also White v. Maryland*, 373 U.S. 59, 60 (1963) (holding that a preliminary hearing was a critical stage because the "petitioner entered a plea before the magistrate and that plea was taken at a time when he had no counsel"); *Tovar*, 541 U.S. at 87 ("A plea hearing qualifies as a critical stage." (internal quotation marks omitted)); *United States v. Roy*, 855 F.3d 1133, 1147 (11th Cir. 2017) (en banc) (explaining that critical stages "of a criminal proceeding where the defendant has a right to counsel" include "an arraignment, . . . a preliminary hearing, [and] a plea hearing").

Hakim lacked "the Assistance of Counsel for his defence," U.S. CONST. amend. VI, at all stages of the pretrial process. This period included his arraignment before the magistrate judge at which a plea was entered in his behalf; it included the period during which the government extended to him "a plea offer"; and it included another hearing at which he attempted "to enter a change of plea" based on a decision at which he arrived "on [his] own," without help from his standby counsel. At both the initial arraignment and the hearing at which Hakim attempted (without success) to plead guilty, "plea[s] w[ere] taken . . . when he had no counsel."

*White*, 373 U.S. at 60. These stages of the pretrial process were critical, *Frye*, 566 U.S. at 140; *Roy*, 855 F.3d at 1146–47; *Molignaro*, 408 F.2d at 798–99, so Hakim was deprived of his constitutional right to counsel.

The constitutional error was structural. *White v. Maryland* establishes both that a plea hearing is a critical stage, and that "we do not stop to determine whether prejudice resulted" because "[o]nly the presence of counsel could have enabled this accused to know all the defenses available to him and to plead intelligently." 373 U.S. at 60 (internal quotation marks omitted). And our precedents hold that "[i]f the Government cannot meet [its] burden [to prove a valid waiver], the defendant need not show prejudice to obtain a reversal." *Stanley*, 739 F.3d at 644; *accord Cash*, 47 F.3d at 1090 n.5 ("Because a trial court's acceptance of an invalid waiver of the Sixth Amendment right to counsel is not subject to harmless error analysis, we do not inquire into whether a different result would have obtained had Appellant been represented by counsel at trial." (citation omitted)); *United States v. Fant*, 890 F.2d 408, 410 (11th Cir. 1989) ("The importance of [ensuring that a waiver is made knowingly, intelligently, and voluntarily] is underscored by the fact that a violation of [the] right [to counsel] is not subject to harmless error analysis."); *see also Chapman v. United States*, 553 F.2d 886, 891 (5th Cir. 1977) ("The nature of the right to defend pro se renders the traditional harmless error doctrine peculiarly inapposite."). It follows that the deprivation of Hakim's right to counsel at all pretrial stages of the proceedings against him was a structural

error. "The fact that the evidence against [Hakim] was overwhelming plays no part in the analysis, because the denial of a right to counsel cannot be harmless error." *Strozier v. Newsome*, 871 F.2d 995, 997 n.3 (11th Cir. 1989).

## IV. CONCLUSION

We **VACATE** Hakim's conviction and **REMAND** to the district court for further proceedings.

GRANT, Circuit Judge, dissenting:

I disagree with the majority's conclusion that we should review de novo whether Saleem Hakim validly waived his Sixth Amendment right to counsel. Instead, plain error review should apply, and under that standard his conviction stands.

## I.

In recent years, our Circuit has repeatedly recognized, but left open, the question of whether plain error review applies when a defendant challenges the validity of his right-to-counsel waiver for the first time on appeal. *See United States v. Muho*, 978 F.3d 1212, 1218 n.2 (11th Cir. 2020); *United States v. Owen*, 963 F.3d 1040, 1048 n.5 (11th Cir. 2020); *United States v. Stanley*, 739 F.3d 633, 644–45 (11th Cir. 2014). The majority now makes a choice; after looking to cases of our sister circuits, it selects de novo review. But those cases based their reasoning on a factual predicate absent here. Not a single one involved a defendant who was represented by an attorney before sentencing, much less before trial.

The Ninth Circuit explained that it did not "expect pro se defendants to know the perils of self-representation," and so could not "expect defendants to recognize that they have not been correctly and fully advised, let alone to point out the court's errors." *United States v. Erskine*, 355 F.3d 1161, 1166 (9th Cir. 2004). It therefore applied plain error review where the defendant represented himself through the rest of the proceedings. *Id.* at 1165–67. The Fourth and Tenth Circuits have since grafted that reasoning

2                    GRANT, J., Dissenting                    19-11970

onto a different set of facts, applying de novo review where new counsel was appointed to represent the defendants only at sentencing. *See United States v. Ductan*, 800 F.3d 642, 646–48 (4th Cir. 2015); *United States v. Hamett*, 961 F.3d 1249, 1254, 1255 n.3 (10th Cir. 2020). But the majority identifies no case that applied de novo review where a defendant, represented by counsel even before trial, still failed to challenge his earlier waiver.

Our Circuit has indicated that plain error review would be "especially" appropriate where a lawyer took over a defendant's representation and "easily could have challenged" his client's "previous waiver before the district court." *Stanley*, 739 F.3d at 645. That's exactly what happened here. Hakim's standby counsel— who attended the arraignment where Hakim chose to proceed pro se and then kept up with the case in his standby role—began representing Hakim before the jury was sworn. He received a week to prepare for the trial, during which he filed new proposed voir dire questions and a motion in limine. He went on to present Hakim's case throughout a three-day trial. But he never challenged Hakim's previous waiver. If there were ever a self-representation case that merited plain error review, this would be it.

A straightforward application of the federal criminal procedure rules directs us to follow that course. Rules 51(b) and 52(b) instruct parties to raise issues to the district court's attention or face plain error review. *See Puckett v. United States*, 556 U.S. 129, 135 (2009). "A party may preserve a claim of error by informing the court—when the court ruling or order is made or sought—of the

action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection." Fed. R. Crim. P. 51(b). A litigant must object in a "timely manner" to preserve the issue. *Puckett*, 556 U.S. at 134.

The very question before us is whether Hakim knowingly waived his right to counsel, so of course we cannot say that, while representing himself, Hakim had a real opportunity to object to the court's acceptance of that waiver. And Rule 51(b) itself recognizes that if "a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party." Fed. R. Crim. P. 51(b). Had Hakim continued to represent himself even through trial, this case would align with those of our sister circuits that applied de novo review, and I would agree with the majority's decision to follow along. *See United States v. Hung Thien Ly*, 646 F.3d 1307, 1312 n.5 (11th Cir. 2011). But that is not what happened.

Instead, Hakim's standby counsel took over his representation well before trial. He thus had "ample occasion" to object—not only before Hakim's conviction, but before the trial even started. *United States v. Davila*, 749 F.3d 982, 993 (11th Cir. 2014). In our Circuit, "it is firmly established" that we apply plain error review when a defendant "fails to object *once the opportunity arises*, regardless of why the unpreserved error was committed or whether the Government or the district court were aware of it." *United States v. Margarita Garcia*, 906 F.3d 1255, 1270 n.3 (11th Cir.

4                          GRANT, J., Dissenting                          19-11970

2018) (quotation omitted and emphasis added); *see also Davila*, 749 F.3d at 993.

An objection once Hakim's counsel stepped in would not have come "too late to allow the district court to correct the error and avert an unnecessary retrial." *Margarita Garcia*, 906 F.3d at 1269 (quotation omitted). The lawyer could have moved to dismiss the indictment or to withdraw the not-guilty plea before the trial began. *See* Fed. R. Crim. P. 12(b)(1) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."). Motions that assert defects in pretrial proceedings occur as a matter of course at that stage—and for good reason. *See, e.g.*, *United States v. Smith*, 983 F.3d 1213, 1217 (11th Cir. 2020); *Davila*, 749 F.3d at 989. These motions, like the plain error rule that incentivizes them, allow district courts to make informed decisions about whether an error occurred, to correct any error brought to their attention, and "to develop a full record on the issue" that will aid review on appeal. *See Margarita Garcia*, 906 F.3d at 1267–68. District courts are not in the business of ignoring them because they were not made immediately after an error allegedly occurred.

The majority criticizes my invocation of *United States v. Davila*, and sets aside that case because there, "the defendant had two opportunities to contemporaneously object to rulings about the validity of his guilty plea, and he failed both times to do so." Maj. Op. at 15. But this rationale proves the point. Consider *Davila*'s facts: the first ruling was the initial acceptance of the guilty

plea, and the second occurred nearly six months later, after the defendant moved to vacate his plea and dismiss the indictment. *Davila*, 749 F.3d at 988–90. The reason plain error review applied is that the latter motion did not assert the error the defendant eventually raised on appeal. *See id.* at 990, 992–93. Under the majority's own reasoning, Hakim would have been able to "contemporaneously object" just like the defendant in *Davila* if he had filed a later motion challenging the validity of his waiver and elicited another ruling from the district court.

Indeed, it is exactly that shortcoming that requires plain error review. Hakim had an opportunity to object once his counsel took over; like the defendant in *Davila*, he could have made use of that opportunity by filing any number of motions that would have allowed him to challenge the validity of his waiver. For whatever reason, his counsel—who was present during the discussion leading up to the waiver—chose not to do so.

Our adversarial system generally requires a party to "look to his counsel to protect him" and to "bear the cost of the lawyer's mistakes." 3B Charles Alan Wright & Peter J. Henning, *Federal Practice and Procedure* § 856 (4th ed. 2013). Those points apply here as well as anywhere. Because Hakim's counsel failed to challenge his waiver once the opportunity arose, we should not apply de novo review.

## II.

Even so, we can review Hakim's challenge under the plain error standard, which provides a narrow exception to the usual rule that we will not correct unpreserved errors on appeal. *See Henderson v. United States*, 568 U.S. 266, 268 (2013). To receive relief under that standard, the defendant must satisfy three threshold conditions: "First, there must be an error that has not been intentionally relinquished or abandoned. Second, the error must be plain—that is to say, clear or obvious. Third, the error must have affected the defendant's substantial rights." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904 (2018) (quotation omitted). Only when those conditions are met may we exercise our discretion "to correct the forfeited error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 1905 (quotation omitted). Hakim has failed to show any "clear or obvious" violation of his right to counsel, so we have no discretion to correct the error he asserts. *Id.* at 1904 (quotation omitted).

## A.

When considering whether any plain error occurred here, a crucial question is what our precedents say about how precisely a defendant must know the range of potential punishments to waive his right to counsel. The Supreme Court supplied the background principle in a plurality opinion issued nearly 75 years ago: a waiver of the right to counsel "must be made with an apprehension of the nature of the charges, the statutory offenses included within them, *the range of allowable punishments thereunder*, possible defenses

to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter." *Von Moltke v. Gillies*, 332 U.S. 708, 724 (1948) (emphasis added). That language does not say how precisely the defendant must understand his maximum potential punishment. But our Circuit's precedents in the years since show that we should not read it to demand quite so much precision as the majority suggests.

Ever since the Supreme Court's 1975 decision in the "foundational self-representation case," *Faretta v. California*, this Circuit has analyzed many factors to decide whether a defendant knowingly waived his right to counsel. *Indiana v. Edwards*, 554 U.S. 164, 170 (2008) (quotation omitted); *see Fitzpatrick v. Wainwright*, 800 F.2d 1057, 1065–67 (11th Cir. 1986); *Stanley*, 739 F.3d at 645–46 (listing the eight factors this Circuit considers). The defendant's "knowledge of the nature of the charges, possible defenses, and penalties" is simply one of those factors. *Owen*, 963 F.3d at 1049. Under our multi-factor approach, which the majority affirms, we have never vacated a conviction solely because a defendant lacked precise knowledge of his potential punishment.

*Molignaro v. Smith*—a case that our predecessor court handed down before *Faretta*—indicates that a defendant must have some awareness of his possible penalty to validly waive his right to counsel. 408 F.2d 795 (5th Cir. 1969). That appeal involved a prisoner who challenged his conviction by arguing that he had not knowingly waived his right to counsel when he pleaded guilty to child molestation. *Id.* at 797. The court found insufficient evidence

that the prisoner "knew the magnitude of the punishment he was accepting by deciding to waive counsel and plead guilty." *Id.* at 797–98. Considering only that line of the opinion, one might read *Molignaro* to establish that defendants knowingly waive their right to counsel only when they understand exactly what their possible penalty is. But the facts of the case can inform our understanding of the point the court was making. The opinion went on to explain (with a sentiment that frankly seems shocking today) that a defendant "who was not aware of the statutory penalties for child molesting might well think he would not be sentenced to more than a year or two." *Id.* at 798. According to the court, when "the actual range extends to twenty years," as it did under Georgia law at the time, the defendant's waiver of the right to counsel could not be described as "voluntary and intelligent." *Id.* (quotations omitted).

The difference between two and twenty years is dramatic. The court's exemplar thus does not suggest that a defendant's understanding of his potential penalties must be precise for a waiver of counsel to survive; to the contrary, it leaves a lot of room for a holistic look at the defendant's understanding of the risks entailed in self-representation, especially when the evidence that he significantly misunderstood his possible penalty is not nearly as substantial. Indeed, the court endorsed a comprehensive inquiry by looking to the "specific circumstances" pertaining to the defendant's understanding of his possible penalty, including his "lack of education" and "lack of previous criminal record." *Id.* at 802. The decision even specifically stated that it did "not purport to dispose of all

cases in which an accused has waived counsel and pleaded guilty without being informed of the maximum penalty applicable" and expressed "no opinion upon the requirements of waiver in less compelling circumstances." *Id.* So limited to its facts, *Molignaro* has only been cited three times by our predecessor court, and not since 1972—three years before *Faretta*. *See Cooper v. Griffin*, 455 F.2d 1142, 1146 (5th Cir. 1972); *Dulin v. Henderson*, 448 F.2d 1238, 1240 (5th Cir. 1971); *Goodwin v. Smith*, 439 F.2d 1180, 1183 (5th Cir. 1971). The majority's opinion is the first to cite the case in the Eleventh Circuit.

Later cases in this Circuit dispel any doubt about whether *Molignaro* sets an exacting standard for the required knowledge. We have since issued decisions finding waivers valid even where the defendant lacked a complete understanding of the penalties he faced. We held in *Fitzpatrick v. Wainwright*, the case that supplied our eight-factor test after *Faretta*, that the defendant's waiver was valid where the record did "not show that he knew the possible penalties he might receive if convicted." 800 F.2d at 1066 n.6, 1068; *see also United States v. Cash*, 47 F.3d 1083, 1088–89 (11th Cir. 1995). Similarly, in *Strozier v. Newsome*, the record showed that the defendant "misunderstood the charges and the penalty," but we nevertheless concluded that he "knowingly and intelligently waived his right to counsel." 926 F.2d 1100, 1106, 1108 (11th Cir. 1991).

These three cases—*Molignaro*, *Fitzpatrick*, and *Strozier*—are not in tension. But even if they were, distilling a rule that

10                    GRANT, J., Dissenting                    19-11970

reconciles them—as we are obligated to do "if at all possible"—is a simple task. *See United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993). Under *Molignaro*, and consistent with our other decisions, a waiver is valid when the defendant is aware of the seriousness of the charges and possible penalties, even when he does not understand those possible penalties with absolute precision. *Molignaro* itself noted "the unlikelihood that a layman would be able to anticipate the length of the sentence for the crime of which he was accused" and emphasized how drastically the defendant's expectations differed from the actual maximum sentence. 408 F.2d at 798, 802. In contrast, the defendants in both *Fitzpatrick* and *Strozier* understood the seriousness of their charges and potential penalties, though they did not know those penalties precisely. The defendant in *Fitzpatrick* "understood the nature of the charges against him and that the charges were serious felony charges." 800 F.2d at 1066 n.6. And the defendant in *Strozier* was informed of "the very serious nature of the charges against him and the tremendous sentences he was facing if he were convicted." 926 F.2d at 1104 n.7 (quotation omitted). Knowledge of penalties is a matter of degree under our factor-based approach—although precise knowledge favors validity, a waiver is not necessarily invalid when that knowledge is lacking.

Several of our sister circuits follow approaches that align with this one. The D.C. Circuit upheld a district court's decision to allow a defendant to represent himself even though the court had misstated the defendant's potential sentence, because he was

still "sufficiently cognizant of the seriousness of the charges against him to make a knowing and intelligent waiver of counsel." *United States v. Bisong*, 645 F.3d 384, 395–96 (D.C. Cir. 2011). The Second Circuit similarly held that a right-to-counsel waiver was valid where the district court did not mention a long potential sentence that could result from upward departures in the Sentencing Guidelines—it found that the defendant had received a "realistic picture" about "the magnitude of his decision," and was "clearly aware of the significant penalties he would face if convicted." *United States v. Fore*, 169 F.3d 104, 108 (2d Cir. 1999) (quotation omitted). The Ninth Circuit requires only that the defendant "substantially understood the severity of his potential punishment under the law and the approximate range of his penal exposure." *United States v. Schaefer*, 13 F.4th 875, 888 (9th Cir. 2021). And the Tenth Circuit considers whether the difference between the defendant's actual maximum sentence and what he understands it to be is "immaterial." *Hamett*, 961 F.3d at 1258 (quotation omitted).

In short, I would answer the question that the majority leaves undecided by concluding that a defendant's precise range of potential sentences is not required knowledge. Misunderstandings about the exact length of the potential punishment, which are all but unavoidable given the complexity of our sentencing system, should not doom a defendant's choice to represent himself so long as a complete review shows that he understood the nature and seriousness of the charges against him. This rule best harmonizes

12                    GRANT, J., Dissenting                    19-11970

our own precedents, and is completely consistent with those of the Supreme Court.

## B.

No matter the difficulty of deciding whether any error occurred here, determining whether the alleged error is "plain" is straightforward.  Under Rule 52(b), we cannot correct an unpreserved error "unless the error is clear under current law" *at the time of our review*.  *United States v. Olano*, 507 U.S. 725, 734 (1993); *see Henderson*, 568 U.S. at 269.  Because this case requires us to clarify the applicable law before we can determine whether the alleged error occurred, any error is not plain.

Even if Hakim misunderstood his maximum possible penalty as one year instead of three, current law does not make clear that this misunderstanding invalidates his waiver.  A difference of two years between an expected and actual potential sentence might have little impact on one's decision to proceed pro se, especially when the charges are all misdemeanor offenses rather than felonies.  On the whole, Hakim appears to have understood the relative seriousness of the charges and the risk that he could be sentenced to prison for a significant period of time if convicted.  And the record shows that the actual sentence Hakim received was, at most, nine months longer than he expected.

More fundamentally, it is not "obvious or readily apparent" on this record that Hakim did misunderstand his maximum potential sentence when he decided to represent himself.  *United States*

v. Young, 470 U.S. 1, 17 n.14 (1985). The majority reasons that the magistrate judge "fell short" of an "obligation" to "inform the defendant *unambiguously* of the penalties he faces if convicted," but then correctly recognizes that "giving materially incorrect information about the defendant's sentence" does not necessarily "render his waiver unknowing." Maj. Op. at 23, 24 (quotation omitted). For the sake of clarity, it bears repeating: we must consider "the trial court's express advice," but "the ultimate test" is "the defendant's understanding." *Cash*, 47 F.3d at 1088 (quotation omitted).

To start, the magistrate judge did not make his statements about Hakim's possible sentence in a vacuum. The magistrate judge first read the criminal information to Hakim and identified the three counts that were "all in violation" of criminal tax law. In context, the magistrate judge described the potential one-year term of imprisonment when explaining that the offense charged was a misdemeanor, not a felony. The magistrate judge "never promised" Hakim "that his sentence would not exceed" one year. *United States v. Kimball*, 291 F.3d 726, 732 (11th Cir. 2002). Because Hakim was told that he faced three charges, and the magistrate judge spoke in the singular when explaining the potential penalties of the charge, Hakim very well could have understood his maximum potential sentence.

That is especially true given the other considerations that we must evaluate to assess Hakim's subjective understanding—including his age, health, and level of education. *See Owen*, 963 F.3d at 1049; *see also Molignaro*, 408 F.2d at 801–02 (considering the

14                    GRANT, J., Dissenting                    19-11970

defendant's knowledge in light of his minimal level of education and his lack of familiarity with criminal statutes).  The majority dismisses those factors, but they support the conclusion that Hakim sufficiently understood his potential penalty.

And finally, putting the issue of potential punishment aside, Hakim has not otherwise clearly shown that he misunderstood the consequences of his choice to represent himself.  He argues that he was confounded about "the nature of the charges against him" and that he did not even understand "whether the case was criminal or civil."  For support, he cites his own statements during his arraignment—excerpts of the dialogue that the majority rightly calls "frivolous and incoherent."  Maj. Op. at 5.  The magistrate judge quite reasonably expressed doubt that Hakim's statements were sincere.  It is therefore not apparent that he actually harbored the misunderstandings he now professes.

★      ★      ★

This case demonstrates the tension that can arise as we seek to enforce the Sixth Amendment's dueling rights to counsel and self-representation.  Overprotecting the former can only come at the expense of the latter.  Saleem Hakim vigorously refused appointed counsel, and the magistrate judge thoroughly warned him of the disadvantages of going it alone.  Today's decision deprives district courts of the benefit of our usual objection requirements for a counseled party when balancing the Sixth Amendment's imperatives.  I respectfully dissent.